**COMMUNITY CARE CENTERS, INC., and Regency Place of Castleton, Appellants,**

**Ben Hur Home, Inc.; Bradner Village Health Care Center; Bradner Village, Inc.; DHE, Inc.; Houston Development, Inc.; Houston Village, Inc.; Premier Providers, Inc.; and Williamsburg Health Care, Inc., Appellant–Intervenors,**

v.

**INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, Katherine L. Davis, Administrator of the Indiana Family and Social Services Administration, in her official capacity; The Indiana Office of Medicaid Policy and Planning, Kathleen D. Gifford, Assistant Administrator of the Indiana Family and Social Services Administration and Administrator of the Indiana Office of Medicaid Policy and Planning, in her official capacity, Appellees,**

and

**Counsel for the Class, Appellee,**

and

**Tioga Pines Living Center, Inc., Bloomington Convalescent Center, Inc., Nominal Appellees.**

No. 30A01–9702–CV–62.

Court of Appeals of Indiana.

Sept. 22, 1999.

Rehearing Denied Nov. 22, 1999.

William P. Tedards, Jr., Washington, D.C., Steven D. Murphy, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, Indiana, Attorneys for Appellant Community Care Centers, Inc.

Anthony W. Mommer, J. Michael Grubbs, Krieg DeVault Alexander & Capehart, Indianapolis, Indiana, Attorneys for Appellants/Intervenors.

Jeffrey A. Modisett, Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, S. William Livingston, Jr., Mark H. Lynch, Robert D. Wick, Covington & Burling, Washington, D.C., Attorneys for Appellees.

David F. McNamar, Randall R. Fearnow, Janet A. McSharar, Alastair J. Warr, McNamar, Fearnow & McSharar, Indianapolis, Indiana, Michael J. Tosick, Greenfield, Indiana, Attorneys for Appellees/Class Counsel.

## OPINION

SULLIVAN, Judge

This appeal arises from the approval of a settlement agreement and the award of Six Million Two Hundred Fifty Thousand Dollars ($6.25 million) in attorney fees in a class action initiated by several skilled nursing facilities and intermediate care facilities which alleged that they were not being properly compensated under the Indiana Medicaid program. Upon appeal, class member Community Care Centers, Inc. (Community Care) and eight class members, who purportedly intervened af-

ter the action was certified as a class action, including Ben Hur Home, Inc.; Bradner Village Health Care Center; Bradner Village, Inc.; DHE, Inc.; Houston Development, Inc.; Houston Village, Inc.; Premier Providers, Inc.; and Williamsburg Health Care, Inc. (Intervenors) challenge the settlement agreement. Intervenors also challenge the trial court's order awarding Class Counsel $6.25 million in attorney fees.[1]

The matters in issue have a long and convoluted administrative, trial and appellate chronological history in several forums. This lawsuit began on January 24, 1990, when several health care facilities, certified under the Indiana Medicaid program, brought an action in the Hancock County Circuit Court against the Indiana State Board of Public Welfare, the Indiana Department of Public Welfare and Suzanne Magnant, in her capacity as the Administrator of the Indiana Department of Public Welfare (collectively the State).[2] (Fee R. 118). *Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.* (1991) Ind.App., 575 N.E.2d 303, *trans. denied* [hereinafter *Tioga I* ]. The Providers filed their complaint under 42 U.S.C. § 1983 [3] and I.C. 34-4-10-1, the Uniform Declaratory Judgment Act, claiming that certain aspects of the Medicaid reimbursement scheme, 470 I.A.C. 5-4.1 (Rule 4.1), did not comply with federal and state law and had not been lawfully promulgated. *Indiana Bd. of Public Welfare v. Tioga Pines* (1993) Ind., 622 N.E.2d 935, 937, *cert. denied,* 510 U.S. 1195, 114 S.Ct. 1302, 127 L.Ed.2d 654 (1994) [hereinafter *Tioga II* ].[4] (Fee R. 149-50). As a result, the

---

**1.** Our opinion cites to the following four records: (1) *Settlement Record* [Sett. R., Vol. 1–12] (the transcript of the proceedings leading up to the approval of the settlement agreement); (2) *Fee Record* [Fee R., Vol. 1–14] (transcript of proceedings leading up to the approval of Class Counsel's petition for attorney's fees); (3) *Preliminary Injunction Record* [P.I.R., Vol. 106] (transcript on the Rule 4.2 injunction); and (4) *Supplemental Record* [Supp. R., Vol. 1–5] (miscellaneous parts of record supplemented by parties on appeal).

**2.** At the time this lawsuit was initiated, the Medicaid system was administered by the Division of Family and Children. However, Pursuant to Acts 1991, P.L. No. 9 § 131, the responsibility for administering the Medicaid system was transferred to the Office of the Secretary of Family and Social Services on January 1, 1992. Thereafter, the Class pursued their claims against the Family and Social Services Administration (FSSA), Katherine L. Davis as Administrator of FSSA, the Indiana Office of Medicaid Policy and Planning (OMPP) and Kathleen Gifford, Assistant Administrator of FSSA and Administrator of OMPP.

**3.** 42 U.S.C. § 1983 provides a federal cause of action against a state official or any person acting under color of state law, who deprives another of his federal constitutional or statutory rights. *See* 1A MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION; CLAIMS AND DEFENSES § 3.1, at 114 (3d ed.1997). In the early 1980s, before this liti-

gation commenced, Congress passed the Omnibus Budget Reconciliation Act which contained an amendment to the federal Medicaid Act. *Tioga I, supra,* 575 N.E.2d at 305. This provision, commonly referred to as the Boren Amendment, required states to ensure that the rates used to reimburse Medicaid providers under their plans were "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards." *Id.* (quoting 42 U.S.C. § 1396a(a)(13)(A)). In 1990, the United States Supreme Court held that Medicaid certified providers may attempt to enforce the Boren Amendment to the Federal Medicaid Act under 42 U.S.C. § 1983. *See Wilder v. Virginia Hosp. Ass'n* (1990) 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455; *see also* SCHWARTZ & KIRKLIN, *supra,* § 4.2, at 443.

**4.** Rule 4.1 was enacted in 1983 when the Department of Public Welfare amended its prior rule to conform to the Boren Amendment. *Tioga II, supra,* 622 N.E.2d at 941. That amendment included the incorporation of the tests of reasonableness, which were used to determine a facility's reasonable costs by comparing major cost centers or total costs of providers with similar care, size and geographic location, and the use of the Gross National Product Implicit Price Deflator (GNP/ipd), which limited a facility's annual rate increase to the general rate of inflation. *Id.* at 941–43. In 1988, the State amended

Providers sought to enjoin the State from implementing Rule 4.1 and to certify the lawsuit as a class action for all similarly situated nursing homes. *Tioga I, supra* at 306. On May 29, 1990, the trial court certified the Class under Ind. Trial Rule 23(B)(2) and (3) as consisting of 785 health care facilities licensed under I.C. 16–10–4[5] and certified as skilled nursing facilities and intermediate care facilities, (Fee R. 148, 151, 156), and appointed David F. McNamar of Steers, Sullivan, McNamar & Rogers[6] and Michael J. Tosick as Class Counsel. (Fee R. 153–54). The trial court granted the petition for a preliminary injunction and ordered the funds, which accrued to the benefit of the Class under the injunction, to be placed in an escrow account. (Fee. R. 156–57); *Tioga I*, 575 N.E.2d at 306. However, that injunction was later overturned on July 22, 1991, when a panel of this court determined that because the facilities had an adequate remedy at law, the trial court abused its discretion by issuing the preliminary injunction. *Id.* at 307. Thereafter, the funds which had been held in escrow were released to the State. (Sett. R. 1236).

On October 20, 1990, the law firm of Casson, Harkins and Greenberg, under the direction of the Indiana Health Care Association (IHCA), petitioned and were thereafter granted leave to intervene on behalf of 151 of the Class members who had been participating in similar litigation in state and federal court (Intervenors).[7] (Supp. R. 619, Sett. R. 2605, Fee R. 2972–76). The purpose of their intervention was to aid Class Counsel in establishing that the Department of Public Welfare's rate-setting criteria violated federal law. (Fee R. 2975, 2978).

Eventually, in February and March of 1991, a trial was conducted on the Class' challenges to Rule 4.1. In March of 1992, the trial court entered final judgment in favor of the Class, concluding that certain aspects of Rule 4.1 violated federal and state law and were not lawfully promulgated. *See Indiana State Bd. of Public Welfare v. Tioga Pines* (1994) Ind.App., 637 N.E.2d 1306, 1310, *reh'g denied,* [hereinafter *Tioga III*]; *Tioga II, supra,* 622 N.E.2d 935. While the trial was in progress, the State promulgated regulations establishing a new reimbursement system, 470 I.A.C. 5–4.2[8] (Rule 4.2) which replaced Rule 4.1 and was to become effective March 29, 1991. (P.I.R. 37–38). As a result, on March 19, 1991, Class Counsel filed a motion to supplement the pleadings

the tests of reasonableness to allow the department also to compare a facility's budgeted items with previous years data for those items. *Id.* at 942. When the providers originally filed this action in 1990, they sought to prove that the GNP/ipd limiter did not comply with the federal Boren Amendment and comparable state law and that the tests of reasonableness adopted in 1988 were not lawfully promulgated. *Id.* at 943–45.

5. This provision has been recodified at I.C. 16–28 (Burns Code Ed. Repl.1998).

6. At the time attorney McNamar was appointed, he was a partner with the law firm Steers, Sullivan, McNamar & Rogers. (Fee R. 153–54). However, after August 1, 1993, McNamar left that law firm and subsequently formed McNamar, Fearnow & McSharar, P.C. (Fee R. 1632).

7. The record reveals that these separate actions, both entitled *Indiana Health Care Asso-*

*ciation et al. v. Suzanne Magnant, et al,* were initiated by the IHCA and the Indiana Association of Homes for the Aged (IAHA), two industry trade associations, on behalf of all members of the IHCA after the *Tioga Pines* litigation had been initiated. (Fee R. 2973–79). In each litigation the IHCA sought to prove that the Indiana Department of Public Welfare's reimbursement scheme violated the federal Boren Amendment and that injunctive and declaratory relief were warranted. (Fee R. 2975–78). The State, however, filed a motion to abstain which the federal district court granted. (Fee R. 2975). As a result, the IHCA directed Casson, Harkins and Greenberg to pursue their challenge to the Medicaid reimbursement scheme in the *Tioga Pines* litigation. (Fee R. 2976).

8. Once responsibility for administering the Medicaid system was transferred to the Office of Family and Social Services on January 1, 1992, 470 I.A.C. 5–4.2 was recodified at 405 I.A.C. 1–4.

and amend the complaint in order to challenge Rule 4.2. (P.I.R. 37, 51–52, 54). In its amended complaint, the Class alleged that the Board of Public Welfare, in promulgating Rule 4.2, failed to comply with the proper procedures. (P.I.R. 58). The complaint further alleged that Rule 4.2 violated federal and state law by establishing a reimbursement system which did not adequately reimburse facilities for the reasonable costs incurred in caring for their residents. (P.I.R. 58–62).

After their motion was granted on March 25, 1991, Class Counsel, with the aid of counsel for the Intervenors, sought to enjoin the implementation of Rule 4.2. (P.I.R. 52, 95). A hearing on the petition to enjoin Rule 4.2 was held on April 8 and 9, 1991. (Fee R. 155, P.I.R. 184–86). During the hearing, both Class Counsel and counsel for Intervenors presented witnesses to show that Rule 4.2 should be enjoined.[9] (P.I.R. 187–593). In particular, counsel for Intervenors presented accounting experts who incorporated into the State's Medicaid reimbursement software the changes Rule 4.2 would have required. Under the changes, the number of facilities which would not be reimbursed for actual costs would have increased under Rule 4.2. (P.I.R. 396–99, 406–10, 421, 445, 494). Intervenors also presented expert testimony that Rule 4.2 did not comply with applicable federal and state law. (P.I.R. 486–87, 504–05). On May 14, 1991, the trial court recertified the Class under T.R. 23(B)(2), issued a preliminary injunction enjoining the implementation of Rule 4.2 and ordered the State to continue to reimburse the class under Rule 4.1.[10] (P.I.R. 1221; Fee R. 170, 173–74). That injunction was upheld by this court which concluded among other things that the Class had established a reasonable probability of success on the merits. *Tioga III, supra,* 637 N.E.2d at 1315.

In 1993, the State's appeal of the trial court's order invalidating Rule 4.1 reached our Supreme Court. After assuming jurisdiction over this case and a separate case in which class member Community Care had obtained similar relief under Rule 4.1 from the Blackford Circuit Court,[11] the Court reversed the trial courts' decisions and determined that Rule 4.1 had been lawfully promulgated and did not violate federal or state law. *See Tioga II, supra,* 622 N.E.2d 935. Our Supreme Court then ordered the Hancock and Blackford Circuit Courts to enter judgment for the State, thereby validating Rule 4.1. *Id.* at 947. Because the additional funds which had accrued under the Blackford injunctions were paid directly to Community Care, as opposed to being placed in escrow, the State instituted an action in the Delaware Superior Court seeking restitution from Community Care for the difference between the amount Community Care received under the Blackford Circuit Court injunction and the amount they would have received under Rule 4.1. *See Community Care Centers, Inc. v. Sullivan*

**9.** Entering an appearance on behalf of the Intervenors were Mark Biros, David Levine and Paul Black. (P.I.R. 187). Michael Tosick and David McNamar appeared on behalf of the Class. (P.I.R. 187).

**10.** The record reveals that although the hearing on the preliminary injunction did not occur until after Rule 4.2 would have been in effect, the parties agreed that if the court granted the injunction, the order would relate back to the date Rule 4.2 went into effect on March 29, 1991. (P.I.R. 99–101).

**11.** The record reveals that Community Care opted out of the original action challenging Rule 4.1 in *Tioga Pines* and pursued its own action against the State in *Community Care Centers, Inc. v. Indiana State Bd. of Public Welfare.* (Sett. R. 2868–70). In that case, the Blackford Circuit Court entered three orders granting partial summary judgment in favor of Community Care. *See Tioga II,* 622 N.E.2d at 937. These orders precluded the Department of Public Welfare from applying the "tests of reasonableness" and the GNP/ipd limiter in setting reimbursement rates for Community Care. *Id.* at 938. Community Care, however, was a member of the class for purposes of challenging Rule 4.2.

(1998) Ind.App., 701 N.E.2d 1234, 1238, *trans. denied.*

In July of 1994, the class action was removed to the United States District Court for the Southern District of Indiana. (Supp. R. 129–33, Fee R. 177).[12] Following negotiations, Class Counsel and the State submitted for approval a proposed settlement agreement regarding the issues concerning Rule 4.2.[13] (Sett. R. 1499, Fee R. 177). Pursuant to the agreement, the Class agreed to release the State from any claims that the Medicaid rules, plan or system, which were applied during any period prior to August 1, 1994, violated state or federal law and to waive the right to seek attorney's fees from the State. (Sett. R. 1647–48, 1650). In exchange, the State agreed never to implement Rule 4.2 or seek to recover any additional funds class members received under the Rule 4.2 injunction from January 1, 1991 to August 1, 1994. (Sett. R. 1646–47).

After several months, Intervenors filed a written objection to the proposed agreement after which Class Counsel, believing they could no longer seek approval of the settlement agreement, due to the number of class members objecting, filed a motion to withdraw the agreement. (Sett. R. 1444, 1499, 1501, 1539). The federal district court, however, denied the motion and approved the settlement agreement on May 8, 1996. (Sett. R. 1552–76).

Soon after approving the agreement, the district court concluded that it did not have subject matter jurisdiction and, as a result, vacated its order approving the settlement agreement and remanded the case to the Hancock Circuit Court on July 16, 1996. (Sett. R. 1590–98, 1601–02). Soon

thereafter on July 29, 1996, Class Counsel requested a status conference and served upon the State interrogatories which were answered on September 6, 1996 and September 24, 1996. (Sett. R. 1605, 1616, 1919, 1923, 1933, 1936). The trial court had set the matter for a hearing on August 15, 1996, and ordered the parties to meet and thereafter submit a status report and case management plan prior to the hearing. (Sett. R. 1608). In compliance with the court's request, Intervenors filed a status report and case management plan which included a request to conduct discovery on whether the settlement agreement conferred a benefit on the class members. (Sett. R. 1615–16). During the hearing, Intervenors informed the court that they had served interrogatories upon the State that day and requested additional time to determine the extent of the benefit conferred upon class members under the agreement. (Sett. R. 2775). The trial court, however, ordered the Class and the State to submit for approval the same settlement agreement previously approved by the United States District Court and denied all requests for further discovery on the merits of the proposed settlement agreement, concluding that there had been ample opportunity for discovery while the case had been pending before the federal court. (Sett. R. 1623–24).

Pursuant to the trial court's order, Class Counsel submitted to the trial court the settlement agreement on August 26, 1996. (Sett. R. 1638). On August 29, 1996, the trial court approved Class Counsel's proposed notice of the class action settlement and ordered Class Counsel to deliver notice to the class members thirty (30) days

---

12. The State sought removal based upon the Class challenge to yet another reimbursement scheme, 405 I.A.C. 1–14 (Rule 14), which was implemented August 1, 1994, and replaced Rule 4.2. (Fee R. 177, Sett. R. 2606). Class Counsel, however, subsequently elected to dismiss the challenge to Rule 14. (Fee R. 177, Sett. R. 1645). Since the promulgation of Rule 14, the State's Medicaid reimbursement scheme has been amended on several occasions. However, none of those reimburse-

ment schemes were challenged by the Class in this litigation.

13. Because the issues concerning Rule 4.1 had been decided by our Supreme Court in *Tioga II, supra,* 622 N.E.2d 935 and the Class elected to dismiss their challenge to Rule 14, the only issue remaining was the lawfulness of Rule 4.2.

prior to October 16th, the date upon which a hearing was scheduled. (Fee. R. 113–24). The notice contained a summary of the proposed settlement and informed the class members of their right to object to the agreement and to appear at the hearing. (Fee R. 117–22). Thereafter, several parties filed motions opposing the proposed settlement agreement including Intervenors, class member Community Care and other individual class members. (Sett. R. 1695–1747, 1780–1847). Intervenors opposed the agreement on several bases, including the following: (1) the agreement required class members to waive their right to seek statutory attorney's fees from the State; (2) Class Counsel improperly relied upon the federal district court's order approving the settlement agreement to support their motion to approve the agreement; (3) the cost of settlement was higher than the cost of proceeding to trial because the class had a high probability of prevailing on the merits; (4) the settlement agreement did not achieve the purpose of the lawsuit of obtaining adequate Medicaid reimbursement; (5) any benefit received by the Class under the settlement agreement was impossible to calculate to a reasonable degree of certainty; (6) the agreement had a disparate impact upon class members in that at least forty-two percent (42%) of the class members would have received higher reimbursement under Rule 4.2; (7) Intervenors were denied meaningful participation in the settlement negotiations; (8) the costs of continued litigation were relatively low; and (9) the majority of the Class, as represented by Intervenors, opposed the agreement. (Sett. R. 1732–47).

Community Care also opposed the agreement on several grounds. In particular, Community Care asserted that the settlement improperly required it to relinquish certain claims which were separate and apart from the Rule 4.2 litigation and erroneously permitted the State to attempt to recover certain funds only from Community Care. (Sett. R. 1842–45).

Prior to the settlement hearing, Class Counsel filed a petition for attorney's fees and litigation expenses under T.R. 23(D) for their efforts in enjoining Rule 4.2 and negotiating the settlement agreement. (Fee R. 139). The court scheduled a hearing on the petition for December 4, 1996, and informed all parties to file their objections a month prior to the hearing. (Fee R. 122). In response, the State, Intervenors and several individual class members filed motions opposing Class Counsel's petition. (Fee R. 740–1017).

On October 16, 1996, the settlement hearing was held, after which the trial court approved the agreement. (Sett. R. 2604–25, 2799). Thereafter, both Intervenors and Community Care appealed the trial court's decision. (Sett. R. 2886, 2901).

On December 4, 1996, the hearing on Class Counsel's petition for attorney's fees was held. (Fee. R. 1673). After taking the matter under advisement, the trial court concluded that Class Counsel had secured for the Class both tangible and intangible benefits. The tangible benefits consisted of at least Sixty-five Million Dollars ($65 million) accumulated under the Rule 4.2 injunction. The intangible benefits consisted of preventing the implementation of Rule 4.2, the discouragement of the State from promulgating further illegal reimbursement systems and promulgating Rule 14. (Fee R. 1631, 1653). The trial court then awarded Class Counsel $6.25 million in attorney's fees. (Fee R. 1659). Four million dollars of the fee award was assessed based upon each facility's proportionate share of the tangible benefits received, (Fee R. 1660) [14] while the remain-

---

14. The benefit a facility received as a result of the Rule 4.2 injunction was determined by three factors: (1) a facility's change of ownership, which allowed certain new providers additional reimbursement by safeguarding against non-recognition of new provider equity, decreased reimbursement for leasing rather than owning, and increased occupancy levels (change of ownership benefit); (2) additional reimbursement for the costs of

ing $2.25 million was assessed according to the number of Medicaid certified beds in each facility. (Fee. R. 1660). The trial court also credited the Class in the amount of $202,000 for attorney's fees paid to Intervenors' counsel by the IHCA. (Fee. R. 1660).

Thereafter, on March 31, 1997, Class Counsel petitioned and was granted an amendment to the Fee Entry to include an allocation of the $4 million in "tangible benefits" and the $2.25 million in intangible benefits among class members. (Supp. R. 560–617). However, Intervenors, other class members and the State, believing that several errors were contained in the Amended Fee Entry, filed motions to correct errors, all of which were denied on June 9, 1997. (Supp. R. 109, 669, 767, 843, 846, 850). Intervenors and Community Care filed timely appeals from that denial. (Supp. R. 109).

On April 22, 1997, the appeals from the settlement agreement and the amended fee entry were consolidated in this court. A pre-appeal conference was held on May 8, 1997, after which Class Counsel and the IHCA, which represented the Intervenors, entered into settlement negotiations. As a result of those negotiations, settlements were reached by the majority of the Intervenors and Class Counsel. The remaining eight Intervenors and Community Care now bring this appeal.

Initially, we note that Intervenors and Community Care have filed separate briefs in this appeal. Community Care challenges only certain provisions of the settlement agreement while Intervenors challenge both the settlement agreement and the award of attorney's fees in favor of Class Counsel. We first address both

Intervenors' and Community Care's contentions with regard to the settlement agreement. Thereafter, we will address Intervenors' several challenges to the award of attorney's fees in favor of Class Counsel.[15]

## I. Propriety of Settlement Agreement

### A. Intervenors

Intervenors contest the propriety of the settlement agreement. Specifically, Intervenors contend that the trial court failed to properly explore the degree of opposition to the agreement. In a related argument, Intervenors contend that because a majority of the Class opposed the agreement and Class Counsel previously attempted to withdraw the agreement in the federal court based upon the amount of opposition, the settlement agreement should not have been approved. Finally, Intervenors contend that the trial court erroneously prevented them from conducting discovery regarding the adequacy and propriety of the settlement agreement. However, before we reach the merits of Intervenors' contentions, we must first address Class Counsel's assertion that some of the Intervenors are not properly before this court on appeal.

### 1. Right of Unnamed Class Member To Challenge Settlement Agreement

Class Counsel contends that four challengers, including Bradner Village, Georgetown Manor, formally known as Houston Village, Williamsburg Health Care, Inc. and Williamsburg Health Care—Vent, are not properly before this court as named class members challenging the settlement agreement and award of attorney's fees.[16] Relying upon *Felzen v.*

providing oxygen, supplies and therapies (the ancillaries benefit); and (3) additional reimbursement for costs of ownership and operation of the facility which varied among facilities depending upon the facility's individual costs of operation (per diem benefit). (Sett. R. 2613–15, Fee R. 1660).

**15.** The State filed an appellee's brief for the sole purpose of addressing the issues surrounding the settlement agreement.

**16.** Class Counsel contends that because Bradner Village contested the assessment of attorney's fees by filing a written objection, it may challenge only the Amended Fee Entry. Class Counsel's Brief at 16.

*Andreas* (1998) 7th Cir., 134 F.3d 873, 874–75, *cert. granted in part*, —— U.S. ——, 119 S.Ct. 29, 141 L.Ed.2d 789, and *judgment aff'd. by* 525 U.S. 315, 119 S.Ct. 720, 142 L.Ed.2d 766, Class Counsel argues that these class members were required but failed to formally intervene in the trial court as a named party in order to challenge the approval of the settlement agreement on appeal. According to Class Counsel, the aforementioned facilities were not among the original 151 class members who had formally intervened prior to the settlement and, therefore, they may not challenge the settlement agreement.

Class Counsel correctly notes that recently the Seventh Circuit in *Felzen, supra*, 134 F.3d at 874–75, concluded that, in order to contest the approval of a class action settlement agreement on appeal the unnamed class member must have formally intervened as a named party in the trial court prior to bringing an appeal. The *Felzen* court's conclusion is based upon the notion that only parties to a lawsuit may appeal from an adverse judgment and that control of the class action should not be fragmented by allowing unnamed class members to usurp the role of the class representative. *Id.* The court in *Felzen* then expressly overruled any prior Seventh Circuit cases which may have permitted an unnamed class member, who objected to some aspect of the class action but failed to formally intervene, to appeal "a decision of any kind in a class action." *Id.* at 875.

■ Initially, we note that the rule announced in *Felzen* is not a statement of well-settled law. As the *Felzen* court noted, "[c]ourts have disagreed for several decades about whether class members ... must intervene as parties" in order to appeal an adverse decision. *Felzen, supra*, 134 F.3d at 874. While some courts require formal intervention by an unnamed class member as a prerequisite to chal-

lenging a settlement agreement on appeal, other courts require only that the class member file a written objection to the proposed settlement. Other courts require class members to take no action at all. *See* Timothy A. Duffy, Comment, *The Appealability of Class Action Settlements by Unnamed Parties*, 60 U.Chi.L.Rev. 933, 935–40 (1993). However, even if we were to require formal intervention by an unnamed class member as a prerequisite to challenging a settlement agreement on appeal, Class Counsel has failed to demonstrate that these specific facilities were not among the original group of Intervenors and, consequently, has waived this issue.

■ On appeal, it is a complaining party's duty to direct this court's attention to the portion of the record which supports its contention. *Campbell v. El Dee Apartments* (1998) Ind.App., 701 N.E.2d 616, 621. This is mandated by our appellate rules. *See* Ind. Appellate Rule 8.3(A)(7) (stating that the argument "shall contain ... parts of the record relied upon...."). The purpose of the rule is to relieve courts of the burden of searching the record and stating a party's case for him. *Young v. Butts* (1997) Ind.App., 685 N.E.2d 147, 151; *Martin Chevrolet Sales, Inc. v. Dover* (1986) Ind.App., 501 N.E.2d 1122, 1130; *Terpstra v. Farmers and Merchants Bank* (1985) Ind.App., 483 N.E.2d 749, 753–54, *trans. denied.* Although the failure to comply with the appellate rules does not necessarily result in waiver of an issue, it is appropriate where noncompliance impedes our review. *Terpstra, supra* at 752, 754.

In their brief, Class Counsel acknowledges that Intervenors' counsel formally intervened on behalf of at least 151 members of the class.[17] Class Counsel further asserts that these appellants "were not part of the group comprising the original Intervenors." Class Counsel's Brief at 16.

---

17. In their brief, Class Counsel asserts that Intervenors' counsel represented 152 class members. Class Counsel's Brief at 3.

However, following that assertion, Class Counsel fails to include a citation to the record where the petition to intervene can be located or any other evidence supporting their contention. In fact, with regard to this argument, Class Counsel has provided this court with absolutely no record citations. This failure is contrary to Appellate Rule 8.3(A)(7).[18]

This omission substantially impedes our review and, therefore, results in waiver of Class Counsel's argument. This case involves multiple volumes of at least four separate records and numerous parties and issues. By failing to direct this court to the original petition to intervene or some other evidence which would demonstrate that these facilities were not among the original 151 class members who intervened, Class Counsel places the burden of searching the record on this court. In a case of this magnitude we decline to shoulder that burden. As a result, we proceed for purposes of this appeal, upon the proposition that each of these facilities may contest the settlement agreement and fee award.

### 2. Approval of the Settlement Agreement

We turn to Intervenors' contentions concerning the settlement agreement. Intervenors argue that the trial court failed to properly explore the degree of opposition to the agreement. Specifically, Intervenors argue that the trial court failed to provide "an adequate explanation of how

or why the court [discounted]" the evidence regarding the number of objectors and that this failure amounts to reversible error. Intervenors' Brief at 41. Intervenors also contend that because a majority of the class members opposed the agreement and Class Counsel had previously attempted to withdraw the agreement in federal court due to the amount of opposition, the trial court erroneously approved the settlement agreement.

Pursuant to Ind. Trial Rule 23(E), a trial court is required to evaluate a proposed settlement agreement in a class action to determine whether it is fair, reasonable and adequate, and to decide whether it is in the best interest of all class members. *Hefty v. Certified Settlement Class* (1997) Ind., 680 N.E.2d 843, 849, *reh'g denied.*[19] In making this determination, the trial court must "comprehensively" consider several factors, including the following: (1) the degree of opposition; (2) the strength of the plaintiff's case on the merits measured against the terms of the settlement; (3) the complexity, length, and expense of continued litigation; (4) the benefit of the settlement to class representatives and their counsel compared to the benefit of the settlement to class members; (5) the opinion of competent counsel as to the reasonableness of the settlement; and (6) the stage of the proceedings and the amount of discovery completed. *Id.* at 851–52.[20] Thus, as Intervenors contend,

---

**18.** We do note, however, that one of the four entities sought to be excluded by Class counsel, "Williamsburg Health Care—Vent," is not as an entity separate from Williamsburg Healthcare, Inc., among the Intervenor–Appellants specified in the appellate brief filed on behalf of those parties. It is open to question, therefore, whether Class Counsel has accurately categorized those who have been or are now parties to the litigation.

**19.** Specifically, T.R. 23(E) provides that a "class action shall not be dismissed or compromised without the approval of the court...."

**20.** *Hefty* was not decided until after the trial court in the instant case conducted its exami-

nation of the settlement agreement. Therefore, the trial court used the following factors which varied slightly from those set forth in *Hefty:* (1) the strength of the plaintiffs' case on the merits balanced against the relief offered in the settlement; (2) the defendant's ability to pay; (3) the complexity, length, and expense of further litigation; (4) the amount of opposition to the settlement; (5) whether the settlement was the product of collusion; (6) the reaction of members of the class; (7) the opinion of competent counsel; and (8) the stage of the proceedings and the amount of discovery completed. (Sett. R. 2610–22). Nonetheless, by using the factors set forth above, the trial court necessarily applied all of the factors set forth in *Hefty.* Further, although the Supreme Court renamed the

the trial court had a duty to consider the amount of opposition in its evaluation of the settlement agreement.

Here, the record reveals that the trial court, in its Entry Approving the Proposed Settlement Agreement, recognized that the Intervenors represented the interests of the majority of the Class.[21] (Sett. R. 2619). The trial court also noted that Intervenors had "objected on multiple grounds" and that there was "substantial opposition" to the settlement agreement. Settlement Record at 2608, 2619. However, the trial court also noted that although the majority of the class members opposed the settlement, "the nature, substance and plausibility of the Intervenors' objections . . . carry considerably less weight than the alleged sheer number of Class members asserting these objections would otherwise indicate." Settlement Record at 2619. The record also reveals that the trial court methodically addressed each of Intervenors' many objections and concluded that those objections were not "sufficiently credible or substantial to warrant rejection" of the settlement agreement. Settlement Record at 2622. Thus, contrary to Intervenors' contentions, the trial court comprehensively explored the degree of opposition to the settlement agreement and provided an adequate explanation for discounting the number of objections.

■ Having concluded that the trial court engaged in a comprehensive evaluation, we now address Intervenors' contention that the trial court should not have approved the agreement because of the number of objections and Class Counsel's prior attempt to withdraw the settlement agreement in the federal court due to the substantial number of class members opposing the agreement. As noted, the trial court found that a majority of the Class opposed the settlement agreement and that there was substantial opposition to the agreement. Further, as Intervenors contend, Class Counsel filed a motion to withdraw the settlement agreement in the federal district court after Intervenors objected to the agreement. In that motion, Class Counsel noted that because the Intervenors represented approximately 59% of the Class, counsel could not "continue to seek approval of the proposed Settlement Agreement." Settlement Record at 1501.

■ Despite Class Counsel's motion, the degree of opposition is only one of several factors the trial court considers in determining whether a settlement agreement is fair, reasonable and adequate. *Hefty, supra,* 680 N.E.2d at 851–52. Further, the amount of opposition is not necessarily indicative of the inadequacy of a settlement agreement and in most cases should not be given undue consideration in determining the fairness of a proposed settlement. *Id.* at 856; *Anderson v. Torrington Co.* (1991) N.D.Ind., 755 F.Supp. 834, 844–45 (noting that "[s]ettlements have been approved in face of objection by even larger portions of the class."). Thus, we de-

---

"'collusion'" factor, it did so only because "the language of that factor [did not] accurately capture[] the improper conduct of class representatives and counsel that could implicate the fairness of the settlement." *Hefty, supra,* 680 N.E.2d at 852. The nature of the analysis, however, did not change.

21. Specifically, the trial court found as follows: "There appears to be substantial opposition to portions of the Settlement Agreement, given the fact that the Intervenors' interests are being purportedly represented by the Indiana Health Care Association, [IHCA] which in turn reportedly represents approximately 60% of the Class." Settlement Record at 2619. Thus, the trial court

concluded that because Intervenors' counsel spoke on behalf of all members of the IHCA, 330 of which were participating in this litigation, Intervenors necessarily represented a majority of the Class. This finding is supported by the record which reveals that counsel for Intervenors were hired by the IHCA to represent not only the 151 Intervenors but also the 330 members of the IHCA. (Fee R. 2973–76, 3023–39; Sett. R. 1745). As the Class consisted of 785 Medicaid certified facilities, the 151 class members who formally intervened and the 330 members of the IHCA constituted a majority of the class.

cline to reverse this settlement based solely upon the fact that there was substantial opposition to the agreement.

Moreover, we agree with the trial court that the nature of the Intervenors' objections does not preclude approval of this agreement. Intervenors objected to both the substance of the agreement and other issues surrounding the agreement. With regard to their substantive objections, Intervenors were largely concerned with the waiver of their right to seek attorney's fees from the State as prevailing parties [22] under 42 U.S.C. § 1988.[23] According to Intervenors, the Class had a good chance of prevailing on the merits as indicated by the affirmance of their injunction on appeal and, therefore, would have been entitled to attorney's fees had they proceeded to trial and prevailed. Intervenors also asserted that because they would be responsible for Class Counsel's fees under the agreement and that the cost of proceeding to trial was relatively low, the cost of settlement was higher than the cost of proceeding to trial.[24]

In addressing Intervenors' objections, the trial court acknowledged in its order approving the settlement, that because this court had previously upheld the Rule 4.2 injunction, the class had a good chance of prevailing at a trial on the merits.[25] (Sett. R. 2617). The trial court also noted that if the settlement were approved, Class Counsel would likely attempt to seek its fees from the Class. (Sett. R. 2616). Nevertheless, the trial court observed that the settlement agreement had provided the Class with all the relief they could have obtained had they prevailed at a trial. In particular, the court noted that the settlement agreement had preserved at least $61 million in additional funds under the Rule 4.2 injunction. The trial court also noted that although the class had a good chance of prevailing on the merits, the class failed to "consider the possibility the State could eventually prevail in litigation" allowing the State to dissolve the injunction and recoup the substantial benefit preserved under the injunction. Settlement Record at 2612. The trial court then concluded that because the Class obtained all of the relief to which it would have been entitled, sacrificing the right to seek statutory attorney's fees was a relatively small concession in comparison to the benefit. The trial court also concluded that the benefit conferred upon the class "significantly outweigh[ed] the uncertainty of allowing this case to proceed to trial...." Settlement Record at 2619.

**22.** 42 U.S.C. § 1988 allows only a prevailing party to request attorney's fees. 2 MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, Section 1983 Litigation; STATUTORY ATTORNEY'S FEES, § 2.1, at 12 (3d ed.1997). A prevailing party is a party who obtains some relief on the merits of his claim through a judgment or settlement agreement. *Tioga II, supra,* 622 N.E.2d at 946. In either case, the party must secure relief which directly benefits him at the time of the judgment or settlement. *Id.* at 947.

**23.** 42 U.S.C.A. § 1988(b) (West Supp.1999) provides that in an action or proceeding to enforce § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...."

**24.** The State contends that the award of attorney's fees to class counsel "has nothing to do with the court's approval of the settlement agreement." State's Brief at 7. While we acknowledge that the settlement agreement did not contain a specific provision awarding attorney's fees to Class Counsel, it clearly precluded the plaintiffs from attempting to seek statutory attorney's fees from the State. As the fee waiver provision clearly entered into the analysis concerning the fairness, reasonableness and adequacy of the settlement, we cannot agree with the State's assertion.

**25.** On appeal from the court's order granting the preliminary injunction enjoining Rule 4.2, this court concluded that the Class had demonstrated a reasonable likelihood of success on the merits on its procedural claim against the State. *Tioga III, supra,* 637 N.E.2d at 1315. Specifically, we noted that the State had failed to show that it had engaged in the required findings process to conclude that the allowable costs which efficient and economically operated facilities incurred were sufficient to provide patients the level of care required by federal and state standards. *Id.* at 1314–15.

The Intervenors also contended that the settlement agreement failed to achieve the purpose of the lawsuit of obtaining adequate Medicaid reimbursement and that the agreement had a disparate impact upon class members because 42% of the class members would have received more reimbursement under Rule 4.2 than Rule 4.1. However, the trial court found that although the Class sought an increase in Medicaid reimbursement in the original challenge to Rule 4.1, the appropriate focus of the settlement was Rule 4.2 and that Intervenors' contention did not address the merits of the settlement agreement. (Sett. R. 2617). Further, in regard to Intervenors' assertion concerning the disparate impact of the agreement, the trial court found that although there was some evidence which suggested that some individual class members would have benefitted from Rule 4.2 "to some degree" that benefit was limited to the per diem reimbursement component, only one of the three factors used to determine the aggregate benefit for a particular class member. Settlement Record at 2620. The trial court then concluded that this fact did not require rejection of the settlement agreement.

The trial court also addressed Intervenors' contention that the benefit conferred upon the Class by the settlement agreement was impossible to calculate to a reasonable degree of certainty. First, the trial court noted that "an exact calculation of the Additional Reimbursement Benefits or a member-by-member analysis of how the Additional Reimbursement Benefits were distributed" was not necessary to determining whether the agreement was fair, reasonable and adequate. Settlement Record at 2613. The trial court also found that based upon discovery provided by the State, the Class as a whole had obtained at least $61 million under the Rule 4.2 injunction. In particular, the court noted that there were three factors used to calculate the aggregate benefit provided to Medicaid certified facilities under the injunction, the per diem component, which varied depend-

ing upon an individual class member's costs of operation, the ancillary component, which preserved reimbursement for oxygen, supplies and therapies, and the change of ownership component which preserved reimbursement for new facilities. The trial court then found that under the first component, Rule 4.2 would have reduced statewide per diem reimbursement by at least $11.7 million. (Sett. R. 2614). With regard to the ancillary benefit, the trial court found that providers would have been limited to the actual cost of reimbursement for oxygen, supplies and therapies under Rule 4.2, while under Rule 4.1, providers received 150% of their costs for oxygen and supplies and 125% of their costs for therapies. (Sett. R. 2614). The trial court then estimated the total benefit to be approximately $49 million. (Sett. R. 2615). Finally, with regard to the change of ownership benefit, the trial court noted that although Class Counsel estimated the benefit to be approximately $48 million, the court did not include this number in the estimated aggregate benefit because of a lack of information available. (Sett. R. 2615).

The record also reveals that the trial court addressed Intervenors' contentions concerning certain procedural irregularities surrounding the agreement. With regard to Intervenors' allegation that they were denied meaningful participation in the settlement negotiations, the trial court conceded that Intervenors' counsel did not sign the settlement agreement. However, the trial court also found that Intervenors were adequately informed of the negotiation process and progress and that Intervenors' suggestions were incorporated into the settlement agreement. (Sett. R. 2621). Finally, the trial court addressed Intervenors' concern that Class Counsel had improperly relied upon the federal district court's order in approving the settlement agreement. The trial court conceded that the district court's order was a nullity. However, the trial court also noted that the critical issue was the content of the

agreement and that the terms of the agreement were "plain, and understanding the agreement require[d] no extraneous commentary or interpretation." Settlement Record at 2609.

■ On appeal, we review the trial court's determination that an agreement is fair, reasonable and adequate for an abuse of discretion. *Hefty, supra,* 680 N.E.2d at 848, 857. Here, Intervenors challenge none of the court's specific findings and contend only that because there was substantial opposition, the agreement should not have been approved. However, we agree with the trial court that the number of objections did not require rejection of the settlement agreement. Under the agreement, Intervenors received all of the relief they would have received had they proceeded to trial and prevailed upon the merits. Additionally, under the agreement, the Class received a substantial benefit, at least $61 million in additional reimbursement they would not have received had Rule 4.2 been in effect. Further, although under the agreement individual class members benefited to different degrees, the same result would have occurred had the Class prevailed at trial, as the amount each facility secured under the Rule 4.2 injunction was determined in part upon that facility's costs of operation which determined its rate of reimbursement. Finally, even if a facility received less per diem reimbursement under Rule 4.2 than Rule 4.1, pursuant to the evidence of record, all facilities received less reimbursement under the ancillary component.

■ In any settlement agreement, a party must expect to surrender some argu-

ably beneficial prospect. *See Anderson, supra,* 755 F.Supp. at 845. Here, the Class received all of the benefits they would have received had they proceeded to trial in exchange for their agreement not to seek statutory attorney's fees from the State under § 1988. Considering that such fee waiver provisions are permissible, *see Evans v. Jeff D.,* (1986) 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (approving class action settlement agreement which contained waiver of statutory attorney's fees under § 1988 where class secured relief greater than that which class could reasonably have expected to achieve at trial), *reh'g denied,*[26] and that the trial court comprehensively explored all of Intervenors' objections but ultimately concluded that they did not require rejection of the settlement agreement, we find no abuse of discretion.

### 3. Discovery

■ Intervenors argue that after the case was remanded from the federal district court, the trial court erroneously denied their request to conduct discovery to determine the extent of the benefit conferred upon class members under the settlement agreement. Specifically, Intervenors contend that this information was necessary to show "the unfairness of the Settlement Agreement." Intervenors' Brief at 41–42. Intervenors further contend that they were prejudiced by the denial of their request because the trial court, after denying all further requests for discovery at the status conference on August 15, 1996, thereafter relied upon answers to interrogatories obtained by

**26.** Our research reveals and none of the parties dispute that *Evans v. Jeff D.* is a valid statement of the law. However, we did discover one case, *Fernando v. Hotel Nikko,* 1992 WL 350312, which indicated that *Evans v. Jeff D.* had been overruled by the Civil Rights Act of 1991. However, *Fernando* did not indicate which part of the Act overruled *Evans.* Further, our review of the Civil Rights Act of 1991 did not reveal any provision which might have overruled *Evans.* Finally, additional research revealed that although Con-

gress considered a proposal to overturn *Evans,* it did not include that proposal in the final version of the Act. *See* Ronald D. Rotunda, Symposium, *The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation,* 68 Notre Dame L.Rev. 923, 949 n. 119 (noting that although Congress considered a proposal to overturn *Evans v. Jeff D.* in the Civil Rights Act of 1991, it ultimately decided not to include the proposal in the final version of the bill).

Class Counsel from the State on September 6, and 24, 1996.

As Intervenors contend, the record reveals that after the case was remanded to the trial court, a status conference was held on August 15, 1996, during which Intervenors' counsel sought permission from the court to use answers to interrogatories served upon the State that same day, to determine the benefit received by class members under the Rule 4.2 injunction. (Sett. R. 1616, 2757, 2761–63, 2775, 2781). The trial court, however, determining that the Intervenors had been given sufficient opportunity to conduct discovery while the settlement agreement was pending before the federal district court and that Intervenors had accumulated sufficient information regarding the benefits of the Rule 4.2 injunction by participating in the preliminary hearing, denied their request. (Sett. R. 1623–24, 2784). Although we would normally review the trial court's decision for an abuse of discretion, *see* HERBERT B. NEWBERG & ALBA CONTE, 2 NEWBERG ON CLASS ACTIONS § 11.57, at 11–140 to 41 (3d ed.1992) (trial court is accorded discretion in determining whether to grant discovery request by a class member who opposes a proposed settlement agreement), we need not do so in the instant case because Intervenors have failed to establish that they were prejudiced by the trial court's denial of their request. *See National Eng'g & Contracting Co., Inc. v. C & P Eng'g & Mfg. Co., Inc.* (1997) Ind.App., 676 N.E.2d 372, 375 (trial court's ruling concerning discovery will not be reversed absent a showing of prejudice).

The gravamen of Intervenors' prejudice claim is that the trial court, after prohibiting all further discovery requests once the case was remanded from the federal district court, thereafter relied upon answers to interrogatories obtained by Class Counsel from the State. Here, the record reveals that Class Counsel did serve interrogatories upon the State on July 29, 1996, after the case had been remanded to the trial court.[27] (Sett. R.1919). The record further reveals that although the trial court prohibited any further discovery responses to be submitted in support of or opposition to the settlement agreement, Class Counsel in its Response to Objections to Approval of Settlement Agreement did rely upon the responses obtained from the State[28] to establish the total benefit conferred upon class members under the Rule 4.2 injunction.[29] (Sett. R. 2482, 2487–88). The record also reveals that the trial court acknowledged that this subsequent discovery had been conducted by Class

27. In its interrogatories, Class Counsel sought the following information: (1) the aggregate amount of Medicaid reimbursement paid to class members under Rule 4.1 from April 1, 1991 through July 31, 1994; (2) the aggregate amount of reimbursement which would have been paid to class members under Rule 4.2 from April 1, 1991 through July 31, 1994; (3) the aggregate amount of reimbursement paid to class members for medical supplies and therapies from April 1, 1991 through July 31, 1994; and (4) the aggregate amount of additional reimbursement paid class members due to changes of ownership because of continued utilization of Rule 4.1. (Sett. R.1920).

28. Specifically, Class Counsel relied upon an appendix which had been submitted in support of their Memorandum in Support of the Petition for Attorney Fees and Expenses. (Sett. R. 2482, 2487).

29. Specifically, Class Counsel used the answers to interrogatories to establish the aggregate benefit of two of the three components used to calculate the total benefits received by class members under the Rule 4.2 injunction. Based upon the State's responses, Class Counsel contended that the aggregate benefit with regard to oxygen and supplies was $44,928,134 and $3,687,918 with regard to therapies. (Sett. R. 2487). Class Counsel also cited to the State's answers to interrogatories to support their contention that new providers under the change of ownership component received an aggregate benefit of $48,493,848. (Sett. R. 2488). However, with regard to the per diem aggregate benefit, Class Counsel relied upon information which had been established at the hearing on the Rule 4.2 injunction. (Sett. R. 2486).

Counsel[30] and may have relied upon the State's answers in determining the aggregate ancillary benefit under the agreement.[31] Nevertheless, Intervenors have failed to establish prejudice.

The record also reveals that the State eventually responded to Intervenors' August 15, 1996, discovery request on September 24, 1996. The record further reveals that in its Response to Objections to Approval of Settlement Agreement, not only did Class Counsel rely upon the discovery it received from the State to establish the aggregate ancillary benefit but it also relied upon the discovery Intervenors obtained from the State. (Sett. R. 2487; Fee R. 146, 348). Thus, the trial court had before it Intervenors' discovery from the State. Moreover, the record reveals that the responses the Intervenors received from the State regarding the aggregate ancillary benefit mirrored the responses given to Class Counsel. (Fee R. 348–55; Sett. R.1920, 1935–43). Therefore, even if Intervenors had been permitted to conduct additional discovery, it is not shown that they would have acquired information different from that which was obtained and which was before the trial court. Because the trial court had before it Intervenors' discovery, we fail to see how Intervenors were prejudiced.

## II. Community Care

Class member Community Care, which operated several facilities throughout the State,[32] contends that the trial court abused its discretion by approving the settlement agreement which it alleges allows for disparate treatment of its facilities. Specifically, Community Care contends that paragraph 4 of the agreement, which requires all facilities to relinquish and release any and all claims against the State prior to August 1, 1994, prevents it from going forward against the State with certain claims which it was pursuing before and during this class action but which were unrelated to the Rule 4.2 litigation. Community Care also argues that Paragraph 5 of the agreement improperly discriminates against its facilities by permitting the State to attempt to recover funds which were paid to Community Care in an unrelated action. Accordingly, Community Care asks this court to "temporarily vacate" the settlement agreement and remand the matter to the trial court with instructions to remove those parts of Paragraph 4 and 5 which allow for disparate treatment of its facilities. (Community Care's Brief at 16).

▬▬▬ Initially, we note that a trial court in reviewing a class action settlement is limited to either accepting or rejecting a settlement agreement as a whole. *Evans, supra,* 475 U.S. at 727, 106 S.Ct. 1531. The trial court may not delete language from or modify the agreement in any way. MANUAL FOR COMPLEX LITIGATION § 30.42 at 240 (3d ed.1995). Otherwise, the court would be requiring the parties to accept a settlement to which they did not agree.

30. Specifically, the trial court noted, in its order approving the settlement agreement, that the subsequent discovery had caused Class Counsel to revise its estimates of the aggregate benefit conferred upon the class from $50 million, as asserted in the federal district court, to $109 million. (Sett. R. 2613).

31. Although the trial court noted that Class Counsel contended that the total aggregate benefit secured under the injunction was $109 million, the trial court ultimately concluded that the aggregate benefit to the Class amounted to at least $61 million. (Sett. R. 2615–16). Specifically, the trial court declined to calculate a specific benefit amount

in regard to the change of ownership component, concluding that there were "limitations in the information currently available concerning this component." Settlement Record at 2615. As Class Counsel and the trial court did not rely upon the subsequent discovery to establish the aggregate per diem benefit, the only possible prejudice which Intervenors could have suffered as a result of Class Counsel's discovery would had to have resulted from the ancillary benefits component.

32. Apparently, Community Care sold its fourteen facilities to Legacy Healthcare Inc. via a capital lease on October 30, 1993. (Appendix to Community Care's Brief at No. 4, pg. 1, 2).

*Evans, supra* at 726, 106 S.Ct. 1531. Thus, on appeal this court may only determine whether or not the trial court abused its discretion in approving the settlement agreement which contained these disputed provisions. Upon making that determination, we may affirm or reverse the trial court's approval. We may not, as Community Care requests, remand this cause for the purpose of deleting portions of the agreement. We now address Community Care's assertions regarding the settlement agreement.

### A. Relinquishment of Separate Claims

Community Care challenges, upon two grounds, the provision in Paragraph 4 of the settlement agreement which requires every class member to relinquish and release "any and all claims that the Medicaid reimbursement rules, plan or system which were applied during any period prior to August 1, 1994 violated any State or federal law." Settlement Record at 1648. First, Community Care contends that, despite additional language in the settlement agreement which explicitly provides that "members of the plaintiff class do not waive any rights to pursue any pending administrative claims or administrative appeals asserting that the reimbursement rules set forth in 470 IAC 5–4.1 were incorrectly applied or implemented in setting reimbursement rates for periods prior to August 1, 1994," the State might attempt to bar its pending administrative claims and a judicial action [33] by characterizing Community Care's claims as systemic challenges to Rule 4.1.[34] Settlement Record at 1648. Community Care also con-

---

**33.** According to Community Care, it is currently pursuing an administrative claim that the FSSA did not have authority to recalculate and lower one of its facility's (Dale Facility) rates for the 1987–1988 year using an audit of the 1986 calendar year and an action pending in the Delaware Superior Court, in which Community Care claimed that the FSSA improperly used a 1988–1989 audit and a certain December 1992 health care cost index to adjust its rates for April 1992 through April 1993. Additionally, without referring to a specific action, Community Care also contends that there are "[o]ther issues which are the subjects of pending administrative appeals by Community Care," including (1) "whether the FSSA's method of setting Medicaid rates complied with a statutory directive in place for a portion of that period that Medicaid providers have an opportunity to make a profit;" (2) "whether the FSSA properly excluded the property tax for Subchapter S Corporations as an allowable cost, while allowing the same tax to be included for other corporations;" and (3) "whether the FSSA's rate-setting methodology was arbitrary and capricious in the handling of several issues involving labor and vehicle costs, home office allocations, and in the application of the principles of the federal Omnibus Budget Reconciliation Act" which might be barred by the settlement agreement language. Community Care's Brief at 4.

**34.** We note that Community Care, after adopting the "Statement of Facts" set forth in the Intervenors' Brief included in its brief, additional "specific facts relevant to [its] particular appeal." Community Care's Brief at 2. Among those additional facts, Community Care chose to include the following assertion with regard to its issue or the relinquishment of claims:

> As this example illustrates, these administrative appeals are difficult to complete and long-delayed, because the FSSA employs a variety of tactics to frustrate and obstruct the progress of the appeals. These include: not assigning hearing officers and not proceeding with the cases; removing a hearing officer whom the FSSA does not favor and inserting another; construing the central issue out of the case by narrowly defining the notice of appeal (the example in paragraph 4, above); assigning its own staff attorney (who is supervising the attorney handling the case) to sit as a reviewing judge in the internal appeal within the agency; automatically overturning any administrative law judge's decision against the agency; and automatically "rubber stamping" any administrative law judge's decision in favor of the FSSA.

Community Care's Brief at 3–4. We remind counsel that pursuant to our appellate rules, the brief of an appellant shall contain a "statement of the facts relevant to the issues presented for review...." Appellate Rule 8.3(A)(5). Community Care's paragraph contains material which is argumentative in nature and irrelevant. Not only is this information inappropriate, it impedes our review of the pertinent issues and, therefore, should not have been included.

tends that requiring all class members to relinquish challenges to every reimbursement scheme used prior to August 1, 1994, is not necessary to the resolution of the issues surrounding Rule 4.2.

■ Initially, we note that Community Care's contention regarding the State's potential use of the settlement agreement language to attempt to bar pending claims is premature. The only issue before the trial court was the reasonableness, adequacy and fairness of the settlement agreement. Further, an actual controversy concerning the preclusive effect of the settlement agreement will arise only if and when the State attempts to use the settlement agreement to attempt to bar one of Community Care's pending actions. However, because the State did not attempt to do so in this case, that issue is not properly before this court.

Moreover, Community Care's concerns appear unwarranted. The settlement language explicitly precludes all facilities, including Community Care, from bringing claims against any reimbursement system which was in effect prior to August 1, 1994.[35] Thus, pursuant to the agreement, no Medicaid certified facility may bring an action challenging the particular reimbursement system as a whole or some aspect of that system. However, the settlement also provides that class members are not compelled to "waive any rights to pursue any pending administrative claims or administrative appeals asserting that the reimbursement rules set forth in 470

IAC 5–4.1 were incorrectly applied or implemented in setting reimbursement rates for periods prior to August 1, 1994." Settlement Record at 1648.

In its appellate brief, Community Care concedes that its administrative appeals and judicial action are based "primarily on grounds that the State has acted 'arbitrarily and capriciously' and contrary to statutes and/or regulations in setting individual rates" and are "not dependent on the Federal Boren Amendment, the Indiana equivalent, or any of the other provisions" relinquished by the Class. Community Care's Brief at 9–10. Thus, it appears that Community Care is challenging only the application of Rule 4.1 and not the rule itself. Thus, although this issue is not properly before this court at this time, we fail to see how this language might bar Community Care's claims.[36]

■ We now address Community Care's assertion that permanently prohibiting challenges to all reimbursement schemes which were in effect prior to August 1, 1994, is not necessary to the resolution of the issues surrounding Rule 4.2. Again, we note that the only issue that was before the trial court is whether the settlement is fair, reasonable and adequate. In applying that standard, we conclude that the trial court did not abuse its discretion in approving the agreement. Admittedly, the settlement agreement was proposed to resolve the Class' systemic challenge of Rule 4.2 and no other prior reimbursement scheme. However, despite the apparent

---

**35.** Paragraph 4 provides that "[e]very member of the class hereby relinquishes and releases any and all claims under 42 U.S.C. § 1396a(a)(13)(A), 42 U.S.C. § 1983, 42 U.S.C. § 1988, IC § 12–15–14–2 (formally codified at IC § 12–1–7–17.6(b)), IC 4–22–2–36, IC § 4–22–2 *et seq.*, or IC § 12–15–13 *et seq.* for additional Medicaid reimbursement or for attorney[']s fees for all periods prior to August 1, 1994 ... and further relinquishes and releases any and all claims that the Medicaid reimbursement rules, plan or system which were applied during any period prior to August 1, 1994 violated any State or federal law." Settlement Record at 1647–48.

**36.** The record also reveals that while the settlement agreement was pending before the federal district court, the State filed a Memorandum In Support Of The Settlement Agreement, in which the State addressed the "unintended ambiguity as to whether class members can file new administrative claims or appeals with respect to the application or implementation of Rule 4.1 for periods prior to August 1, 1994." Settlement Record at 1548. The State then asserted that "[t]he agreement was not intended to bar such claims" and that "this pleading should clarify that such claims are not precluded." *Id.*

effect of the provision, the provision is not as " 'clean sweep[ing]' " as Community Care suggests. Community Care's Brief at 10.

At the time the settlement agreement was submitted for approval, our Supreme Court had already determined that certain aspects of Rule 4.1, which originally had been challenged by the Class, complied with federal and state law and had been properly promulgated. *See Tioga II, supra*, 622 N.E.2d 935. Therefore, as the lawfulness of Rule 4.1 was no longer in dispute, any further attempt by a class member to challenge Rule 4.1, would be barred by the doctrine of res judicata. *See Schultz v. Farm Credit Services of Mid–America, ACA* (1998) Ind.App., 692 N.E.2d 504, 508, (under doctrine of res judicata, judgment on merits is absolute bar to subsequent action between same parties), *trans. denied.* Further, although the doctrine of res judicata would not have barred a class member's challenge to any reimbursement scheme enacted prior to Rule 4.1, the likelihood of any such challenge being successful would be slim.

Rule 4.1, which allowed for prospective reimbursement,[37] was enacted in 1983 to conform to the 1981 Boren Amendment which was passed to reduce the reimbursement paid to Medicaid certified facilities in an effort to control increasing health care costs. *Tioga I, supra*, 575 N.E.2d at 305. However, prior to Rule 4.1, Medicaid providers were reimbursed retrospectively for their reasonable costs incurred. *Id; see also Lett v. Magnant* (1992) 7th Cir., 965 F.2d 251, 252 (noting that the "original Medicaid Act required participating states to reimburse facilities for their 'reasonable' costs in providing care to Medicaid recipients" and that providers were generally paid their actual costs incurred), *reh'g denied.* Thus, we cannot conclude that the settlement agreement which requires class

members to relinquish challenges to reimbursement schemes which were either found to be lawful or never challenged by the Class, is unreasonable or unfair.

### B. State's Ability to Recover Certain Funds Paid to Community Care

 Community Care also challenges a provision in the settlement agreement which allows the State to recoup funds paid to Community Care under an injunction issued in the Blackford Circuit Court. According to Community Care, that provision provides for disparate treatment of its facilities and deprives it of the only benefit conferred upon class members under the agreement because other language in the settlement agreement specifically.prohibits the State from recovering reimbursement paid to all class members from January 1, 1991, through August 1, 1994. In order to resolve Community Care's contention, we must look to the settlement agreement.

As Community Care suggests, Paragraph 2 of the agreement specifically prohibits the State from "seek[ing] to recover any funds paid to class members for the period commencing January 1, 1991 and concluding August 1, 1994 ..." and Paragraph 3 prevents the State from "chang[ing] or depart[ing] from the reimbursement methods that they have actually used to pay class members [from January 1, 1991 through August 1, 1994]...." Settlement Record at 1646–47. As Community Care further suggests, these provisions are qualified by language in Paragraph 5 which allows the State to recover "money paid to the plaintiffs in *Community Care Centers, Inc. v. Indiana State Board of Public Welfare, et al* (Blackford County Circuit Court, No. 05C–01–8808–CP–085) ... as a result of the preliminary and permanent injunctions entered in those cases...." Settlement Record at 1648.

---

**37.** In particular, facilities were reimbursed at a rate that was "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards...." *Lett v. Magnant* (1992) 7th Cir., 965 F.2d 251, 253 (citing 42 U.S.C. § 1396a(a)(13)(A)), *reh'g denied.*

In that case, Community Care obtained from the Blackford Circuit Court two injunctions which enjoined the State from applying two aspects of Rule 4.1, the GNP/ipd limiter and two aspects of the tests of reasonableness. (Sett. R. 2862). *Community Care Centers, Inc. v. Sullivan* (1998) Ind.App., 701 N.E.2d 1234, 1237, *trans. denied.* Thus, under these injunctions Community Care received additional funds which amounted to the difference between what class members received under the injunction and the lesser amount they would have received under Rule 4.1.[38] In contrast, the benefit conferred upon class members under the settlement agreement was the difference between what class members received under the Rule 4.2 injunction and what they would have received under Rule 4.2. Thus, although Paragraph 5 allows the State to recoup funds during the prohibited period of January 1, through August 1, 1994, because Community Care's injunction was not overturned by our Supreme Court's decision in 1993, it does not permit the State to seek to recover the additional funds which were gained under the Rule 4.2 injunction. Thus, Community Care is not denied the benefit provided under the settlement agreement.

We further conclude that allowing the State to recoup the funds under the Blackford Circuit Court injunctions does not provide for disparate treatment of Community Care's facilities. As noted, the injunctions in that case prohibited the State from using certain aspects of Rule 4.1 in setting Community Care's rates. Although the class members in the instant case benefited from a similar injunction issued by the Hancock Circuit Court, the class members in the *Tioga Pines* litigation did not actually receive the additional funds preserved under that similar injunction because the funds were placed in escrow, *see Tioga I, supra,* 575 N.E.2d at 306 (noting that the trial court, upon issuing the preliminary injunction which prevented the State from reducing Medicaid rates, ordered the State to pay into escrow the difference between the amount paid under the old rate and the funds paid under the new rate) and released to the State once the injunction was reversed by this court in July of 1991.[39] (Sett. R. 1236). In *Community Care,* however, the additional funds received under the injunction were paid directly to Community Care's facilities and not placed in escrow. (Fee. R. 169; Sett. R. 2862–63, 2869). As a result, even though our Supreme Court eventually overturned Community Care's injunctions in *Tioga II, supra,* 622 N.E.2d 935, the funds were not returned to the State. Thus, permitting the State to recoup additional funds that no other facility received under these injunctions does not provide for disparate treatment of Community Care's facilities.[40] The settlement

---

**38.** We cannot say that Community Care was receiving "pre-Rule 4.1" rates. Rather, the injunction prohibited the State from using the GNP/ipd limiter as the sole determinant and two aspects of the tests of reasonableness. *See Community Care Centers, supra,* 701 N.E.2d at 1237, 1244 n. 1 (finding that the State recalculated Community Care's rates using state regulations which had not been enjoined, using limiters other than the GNP/ipd and the two aspects of the tests of reasonableness). Thus, during the time the injunction was in place, Community Care facilities received as additional funds, the difference between the money they received under the injunction and the funds they would have received under Rule 4.1.

**39.** The money deposited into the escrow account was the additional funds the facilities were entitled to receive under the injunction, approximately $4,000,000 per month. *See Tioga I, supra,* 575 N.E.2d at 306.

**40.** There is evidence that in 1990 the Blackford Circuit Court issued yet another injunction which enjoined an aspect of the 1988 version of Rule 4.1 and which provided benefits under the change of ownership component. There is also evidence that, although this injunction was overturned by our Supreme Court in 1993, the State did not intend to recoup the additional funds received by class members under that injunction. (Sett. R. 2861). However, the additional reimbursement received under that injunction was

agreement which allows the State to recoup from Community Care funds which were received under the Blackford Circuit Court injunction is not unreasonable, inadequate or unfair as the State is still not permitted to recoup any additional funds Community Care received under the Rule 4.2 injunction from January 1, 1991 through August 1, 1994.[41]

## II. Attorney's Fees

Intervenors challenge the $6.25 million[42] in attorney's fees awarded to Class Counsel. Specifically, they contend that:

(A) the trial court confused two distinct legal doctrines in awarding fees based upon a common fund/common benefit doctrine and, further, that the common benefit doctrine is not recognized in Indiana and, thus, an award based upon it is not justified;

(B) attorney's fees could not properly be awarded in this case based upon the common fund doctrine because the prerequisites to the common fund doctrine were not met;

(C) the trial court misapplied both the percentage and lodestar approaches to determining attorney's fees;

(D) Intervenors should have been declared immune from having to pay attorney's fees pursuant to the purchased immunity doctrine; and

(E) the trial court failed to correct alleged errors in the Amended Fee Entry.

### A. Common Benefit v. Common Fund

Intervenors contend that the trial court erred in applying a combination common fund/ common benefit approach in awarding attorney's fees because they are distinct doctrines. Further, Intervenors contend that "[n]o Indiana rule or caselaw [sic] has adopted the Common Benefit Doctrine. Even the jurisdictions [which] once embraced the Common Benefit Doctrine have distanced themselves from that doctrine because it forces class members to pay money out of their own pockets to attorneys they never hired." Intervenors' Brief at 11.

■■■■■ The common fund doctrine is deeply rooted in American jurisprudence and serves as an exception to the American Rule, which states that each litigant must pay his or her own attorney's fees. *See Trustees v. Greenough* (1882) 105 U.S. 527, 26 L.Ed. 1157. Pursuant to the common fund doctrine, the court may award attorney's fees to a party who initiated the action from a fund created or preserved by that party's counsel. CHARLES ALAN

not the same reimbursement obtained under the Rule 4.2 injunction. Additionally, the relevant issue is not why the State chose not to seek to recover the funds under the 1988 version Blackford injunction but whether it was unfair or unreasonable for the State to seek to recover the additional funds Community Care received under the other two Blackford injunctions. However, we have already concluded that because Community Care was the only facility which received additional funds under Rule 4.1 under these two injunctions, it is not unfair for the State to recoup these funds.

41. Community Care also appears to argue that its facilities received disparate treatment under the agreement because the "FSSA agree[d] to let the 138 class members who avoided the maximum annual limiter by changing ownership under this injunction keep the $48 million they gained but then add[ed] a provision to stop one class member

[Community Care], who avoided the maximum annual limiter by a different injunction, from keeping the more modest amounts it gained." Community Care's Brief at 7.

First, the injunctions under which Community Care received protection from the GNP/ipd limiter were overturned by our Supreme Court in *Tioga II*. Further, the injunction under which these 138 facilities received relief was upheld on appeal and is the subject of this settlement agreement. Finally, although there may have been different ways to achieve the same result, the facilities which sought to avoid the GNP/ipd limiter by changing ownership did so lawfully under the Rule 4.2 injunction.

42. $4 million of the $6.25 million in attorney's fees were allocated among the facilities based upon the tangible benefits conferred upon the Class, and $2.25 million for intangible benefits conferred upon the Class by Class Counsel.

WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2675 (1998). Apparently, the common benefit doctrine is viewed as an extension to the common fund doctrine and was created to allow an award of attorney's fees where the prevailing party "substantially benefitted" others even though the prevailing party did not establish a fund or bring the action on behalf of a class. *See id.; City of Hammond v. Darlington* (1959) 241 Ind. 536, 542–43, 162 N.E.2d 619, 622 (finding that, although attorney who had obtained injunction against bond issue and against payment of judgments by City of Hammond did not create a fund or sum of money, he was, nevertheless, entitled to recover attorney's fees for benefit conferred upon taxpayers), *reh'g denied,* 241 Ind. 536, 173 N.E.2d 662. The common benefit rationale was also implicated by the adoption of the private-attorney-general exception, which allowed for the award of attorney's fees because the litigation had social value or served the public interest. WRIGHT, ET AL., *supra,* § 2675. The doctrine allowed for the recovery of an attorney fee award when (1) a substantial benefit was conferred upon (2) an ascertainable class, and (3) where the fee could be proportionately spread among the class. *See Mills v. Electric Auto–Lite Co.* (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593. The policy underlying both the common fund and common benefit doctrine is to allow a trial court to allocate attorney's fees among a class of similarly situated individuals, who have benefitted from the litigation, so that the representative class member is not forced to shoulder all of the monetary obligation, while those who benefitted reap a benefit for which they have not made a financial contribution. Wright, Miller and Kane, *supra,* § 2675.

In 1975, the United States Supreme Court curtailed use of the common benefit doctrine in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y* (1975) 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141, in which environmental groups filed suit to prevent the construction of the trans-Alaska oil pipeline. Although the Court of Appeals found that the environmental groups had performed the services of a private attorney general and, thus, were entitled to attorney's fees under the private-attorney-general exception, the United States Supreme Court reversed, concluding that the federal courts are powerless to award attorney's fees in the interest of the public absent a statute allowing for attorney's fees. *Id.* at 269–71, 95 S.Ct. 1612.

Commentators have opined that while the *Alyeska* decision specifically reserved the use of the common fund doctrine,[43] it eliminated the private-attorney-general exception and limited application of the remaining common benefit doctrine to cases where the benefit is "readily measurable and is bestowed on an ascertainable class." WRIGHT, ET AL., *supra,* § 2675 ("[T]he common-fund doctrine, which supports fee awards in many class and shareholder derivative actions, remains available, [however,] its extension into more general common-benefit situations was seriously curtailed").[44] Thus, although the

---

**43.** In particular, commentators point to Justice White's statement in the *Alyeska* decision that the common fund doctrine is a well-recognized exception to the American Rule. *See* WRIGHT, ET AL., *supra* at § 2675 (referring to *Alyeska, supra,* 421 U.S. at 257–58, 95 S.Ct. 1612). This observation is confirmed by the Court's statement in a post-*Alyeska* decision. *See Boeing Co. v. Van Gemert* (1980) 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").

**44.** For example, some jurisdictions have held that there is not an ascertainable class if the action benefits the general public and not a discrete group, or where the group cannot easily be defined. *See Northwest Indian Cemetery Protective Ass'n v. Peterson* (1983) N.D. Cal., 589 F.Supp. 921, 924 (plaintiffs who obtained injunction prohibiting United States Forest Service from completing construction of paved road and from engaging in commercial timber harvesting or constructing logging

common benefit doctrine still survives, at least in the federal courts, it has been refined.

Ind. Trial Rule 23, which governs class actions, specifically provides for the award of attorney's fees in class action lawsuits.[45] In particular, T.R. 23(D) states in relevant part as follows: "The court shall allow reasonable attorney's fees and reasonable expenses incurred from a *fund* recovered for the benefit of a class ...." (emphasis supplied). According to Intervenors, because the rule contains the word "fund," "clearly ... Indiana has elected to follow the Common Fund Doctrine, not the Common Benefit Doctrine." Intervenors' Brief at 12. However, one of the definitions of "fund" is "an available quantity of material or intangible resources." WEBSTER'S NEW COLLEGIATE DICTIONARY 465 (1977). Therefore, we cannot agree with Intervenors that the word "fund" used in T.R. 23(D) is determinative of whether this State recognizes only the common fund doctrine and requires that tangible benefits be found before an attorney's fee award may be made.

■ Intervenors further contend that the common benefit doctrine has never been adopted in Indiana. Although Indiana may not have formally recognized the "common benefit" doctrine as an extension of the common fund doctrine, the court in *Darlington, supra*, 241 Ind. at 542, 162 N.E.2d at 621, clearly rejected the notion that a sum of money had to be created before attorney's fees could be awarded. In particular, the court found that "[t]he fact that no fund was brought into existence by the bond issue out of which payment could be made, or that no sum of money was actually recovered, pro-

vides no justification for denying recovery for services rendered...." Courts of this State have also consistently recognized, albeit rarely, a private-attorney-general exception to the American Rule to justify an award of attorney's fees. *See· Saint Joseph's College v. Morrison, Inc.* (1973) 158 Ind.App. 272, 279–80, 302 N.E.2d 865, 870, (recognizing the private-attorney-general theory as an exception to the American Rule) *trans. denied; Greensburg Local # 761 Printing Specialities v. Robbins* (1990) Ind.App., 549 N.E.2d 79, 80 (recognizing private-attorney-general theory), *trans. denied. But see Downing v. City of Columbus* (1987) Ind.App., 505 N.E.2d 841, 845, *trans. denied.* Finally, this court, under the guise of the "common fund" doctrine, has previously awarded attorney's fees where there has been only intangible or unmeasurable benefits bestowed upon a party. *See Robbins, supra* at 80–81 (holding that union members, who successfully defended lawsuit filed by former union president, were entitled to attorney's fees from Union under "common fund" doctrine where union members' efforts, by causing union president's defeat at next election and subsequent increase in union treasury, benefitted Union as a whole); *Neese v. Richer* (1981) Ind.App., 428 N.E.2d 36, 43 (holding that plaintiff in derivative shareholder action was permitted to recover attorney's fees, even though defendants contended there was no pecuniary benefit, where independent accounting requested by plaintiff would substantially benefit corporation), *reh'g denied.* Yet, in none of these actions was Ind. Trial Rule 23(D) discussed or applied. Nevertheless, we conclude that we need not decide whether T.R. 23, by using the word "fund,"

roads in certain parts of national forest, were not entitled to attorney's fees under common benefit doctrine where beneficiary of action was not discrete identifiable group but general public); *Trinity Episcopal Sch. Corp. v. Hills* (1976) S.D.N.Y., 422 F.Supp. 179, 181 (finding that although plaintiffs, who brought action against Department of Housing and Urban Development enforcing public policies of the National Environmental Policy Act ren-

dered benefit to current and future local residents, they did not establish an ascertainable class for purposes of awarding attorney's fees under common benefit doctrine).

**45.** Also, the Indiana rule, unlike the federal rule, requires a trial court to hold a hearing on the issue of class certification.

specifically precludes the application of the common benefit doctrine to justify an award of attorney's fees in this class action because we conclude that there were no intangible or non-pecuniary benefits conferred upon the Class.

■ The record reveals that the trial court referred to three intangible benefits, including the "[1.] prevention of the implementation of an illegal Medicaid reimbursement system, [2.] discouragement of the State from promulgating further illegal reimbursement systems, and [3.] the catalytic effect this litigation had on the eventual promulgation of another Medicaid reimbursement system (Rule 14)." Fee Record at 1653. As to the first "benefit" enumerated by the trial court, there was no trial on the merits regarding Rule 4.2 and, thus, the trial court could not definitively state that Rule 4.2 was an illegal reimbursement system. Although Class Counsel did prevent the implementation of Rule 4.2, which was the desire of the Class, the resulting benefit of that action was not intangible but tangible, as the Class as a whole was permitted to retain $65 million. The second intangible "benefit" recognized by the court was merely an order to "do good and avoid evil," and, thus, no attorney's fees should be attributed to this "benefit." The final "intangible benefit," the promulgation of Rule 14, may or may not have benefitted the Class. If after the settlement agreement, the State had promulgated a legal and valid system, which afforded the Class even less reimbursement than under Rule 4.2, it would be very difficult to view its implementation as an intangible benefit of the settlement procured by Class Counsel. Nothing in the settlement agreement provides assurances that the system implemented thereafter would be more beneficial to the Class than Rule 4.2 would have been. Therefore, the trial court erred in relying upon these "intangible benefits"

for its award of attorney's fees and in allocating fees to facilities based upon them.

■ We further find, as did the Ninth Circuit in *Vincent v. Hughes Air West, Inc.* (1977) 9th Cir., 557 F.2d 759, 768–69, that when an attorney's fee can be based upon tangible benefits or a "fund" the common benefit doctrine should not be applied.[46] *Vincent* involved litigation arising from a fatal commercial airline crash. Upon appeal from the award of attorney's fees to four law firms, which had functioned as lead counsel and which were to be paid from the various settlements reached between Hughes Air West, Inc. and the United States and the crash victims' families, the Ninth Circuit found that "because any benefits derived by the clients of nonlead counsel are pecuniary, the substantial benefit doctrine has no place in this case and that the position of lead counsel must stand or fall on the traditional common fund doctrine." *Id.* (footnote omitted). Therefore, in the case before us, the trial court, to the extent it recognized intangible benefits to support the award of attorney's fees, erred.

### B. Common Fund

While acknowledging that the common fund doctrine is recognized in Indiana, Intervenors argue that three prerequisites to applying the doctrine were not met and, thus, an award of attorney's fees based upon the common fund doctrine was inappropriate. In particular, Intervenors make the following allegations:

(1) there is no "fund" from which to award attorney's fees and which is required by T.R. 23(D) and the common fund doctrine;

(2) even if there is a fund, it is not a "common" fund; and

(3) even if there is a common fund, the trial court did not have jurisdiction over

---

**46.** Specifically, the *Vincent* court noted its belief that the common benefit doctrine was created for those cases where there was an absence of a pecuniary benefit. *See Vincent, supra* at 768–69 n. 7.

the fund to allow the court to award fees from such fund.

### 1. "Fund"

 Intervenors claim that there is no "fund," which is required by T.R. 23 and by the common fund doctrine and from which attorney's fees could be awarded. We disagree. The trial court calculated that because of their successful enjoinment of Rule 4.2, Class Counsel was responsible for gaining payment of at least $65,302,-485 [47] more in reimbursement to the Class than would have been received if Rule 4.2 had been in effect between 1991 and 1994. As well, using the figures provided for each facility, the trial court could readily calculate the tangible benefit received by each class member, and could fairly apportion the fee among the facilities in proportion to the tangible benefit received by each facility. Thus, we conclude that there did exist a tangible fund, from which the trial court appropriately ordered a reasonable award of attorney's fees.

The policy justifications for this conclusion are clear. The injunction in this case was in the best interest of the Class as a whole. If the injunction had not been sought and granted, the Class would have been limited to the remedy of pursuing pecuniary damages after the possible determination by the trial court that the implementation of Rule 4.2 was indeed an illegal system. In that instance, there is no question that there would exist a tangible fund against which attorney's fees could be assessed. However, this option would not have operated in the best interest of the Class. *See Tioga III*, 637 N.E.2d 1306, 1317 ("A remedy which prevents a threatened wrong is in its essential nature better than a remedy which permits the wrong to be done, and then attempts to pay for it by pecuniary damages."). For instance, the Medicaid patients within the facilities would have unnecessarily been deprived of additional funding. Further, we see no appreciable difference between the fund in this case and the fund which might have been created in the scenario described above where the Class seeks damages after the class members have been harmed.[48] As did the trial court, we decline to punish Class Counsel for acting in the best interests of the Class.

Intervenors cite to *Downing v. City of Columbus, supra*, 505 N.E.2d 841, which we find distinguishable. In *Downing*, three city police officers, who were also members of the Indiana National Guard, brought suit against the city for back-pay in the amount deducted from their paychecks while they were on leave engaged in military duties, i.e., the amount of their military pay. A panel of this court determined that the police officers were entitled to their regular pay while they were engaged in military duties for the National Guard. However, we affirmed the trial court's denial of attorney's fees based upon the common fund doctrine. While it is true, as Intervenors noted, that the police officers' action benefitted all those similarly situated in that, because the amount of

---

**47.** The trial court concluded both in its findings and conclusions that the Class was reimbursed at least $65 million (this number derived from $16,254,724 for change in provider benefits, $48,616,051 for ancillaries reimbursement, and $431,710 for per diem benefits—the $431,710, the trial court determined, was inappropriate to use in determining attorney's fees). As Intervenors note, on page thirty of its amended fee award the trial court makes reference to the ancillary benefits totaling $40,252,738. We see no reason why the figure should deviate from the original figure the trial court decided upon, and conclude that the trial court merely misstated that this figure, as opposed to the $48,-616,051 figure, should be considered in calculating the benefit.

**48.** We do note, however, that had the fund been created by seeking damages after the class members were harmed, an individual class member would not have been required to contribute to the award of attorney's fees in an amount which was beyond that individual's proportionate share, as the attorney's fees would be awarded as a percentage of the fund secured.

their military pay will not be deducted from their regular salary in the future, there is no indication that there was a damage award which could have been labeled a common fund, i.e., there was no award of back pay for the class as a whole. Thus, unlike this case in which there was a fund recovered for the Class, in *Downing* the benefits to the class would have been in the nature of increased paychecks in the future to all city police officers serving in the National Guard. The benefit in *Downing* did not amount to ascertainable benefits given to an ascertainable number of beneficiaries and, thus, did not amount to a fund. Here, there was an ascertainable fund from which the trial court was permitted to award attorney's fees.

### 2. "Common"

■ In a related issue, Intervenors claim that because each facility received a different benefit, and because some facilities received no benefit, the common fund doctrine cannot apply in that the fund is not "common" to all class members. For this proposition, Intervenors cite to *Boeing Co. v. Van Gemert* (1980) 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 and *Hagge v. Iowa Dep't of Revenue & Fin.* (1995) Iowa, 539 N.W.2d 148.[49] At issue in *Boeing* was whether attorneys for the class could be awarded a fee from the full amount of damages awarded to the class, or "only the portion of the fund actually claimed by class members" after the judgment was awarded. *Boeing, supra* at 477, 100 S.Ct. 745. According to Intervenors, the United States Supreme Court stated that "[t]he fund must be a 'lump-sum judgment' from which the class members have an 'undisputed and mathematically ascertainable claim.'" Intervenors' Brief at 17 (quoting *Boeing, supra,* at 479, 100 S.Ct. 745). However, in concluding that the attorney's fees could be taken from the entire judgment against Boeing, the Court defined cases to which *common-fund doctrine has*

been correctly applied as having the following similar characteristics: "First, the classes of persons benefited by the lawsuits 'were small in number and easily identifiable.' Second, '[t]he benefits could be traced with some accuracy....' Finally, 'there was reason for confidence that the costs [of litigation] could indeed be shifted with some exactitude to those benefiting.'" *Boeing, supra,* at 478–79, 100 S.Ct. 745 (quoting *Alyeska, supra,* 421 U.S. at 265, 95 S.Ct. 1612) (citations omitted) (comparing this type of class member to a case where litigants are "simply vindicat[ing] a general social grievance"). Under these criteria, attorney's fees were appropriately awarded here. The class members in this case were easily identifiable and the tangible benefit could be easily traced to each facility which received additional funds under Rule 4.2. Finally, because we have concluded that the trial court should have determined the attorney's fees award based solely upon tangible benefits, we conclude that the costs of litigation can be fairly and proportionately allocated among the Class.

In *Hagge, supra,* 539 N.W.2d 148, the Supreme Court of Iowa held that a common fund, from which attorney's fees may be drawn, cannot exist in a tax refund case. Accordingly, the court reversed the judgment of the district court which ordered the Iowa Department of Revenue and Finance (DOR) to withhold five percent of all the retiree class' refunds in order to pay the attorneys who effectuated the refunds. The court concluded that the DOR "owe[d] each affected retiree a separate refund based on each retiree's individualized circumstances." *Id.* at 152.

In explaining its holding, the court stated "[w]e refuse to exercise equitable powers to order DOR to take an action unambiguously proscribed by Iowa law." *Id.* The law to which the Iowa court was referring was IOWA CODE ANN. § 422.73

---

**49.** Intervenors also cite *Rosenbaum v. MacAllister* (1995) 10th Cir., 64 F.3d 1439 in support of their position. However, *Rosenbaum* discussed the common benefit doctrine, which we have previously determined to be inapplicable.

(West 1998), which set forth how tax refunds are to be disbursed. In particular, the statute required that refunds be paid, or a credit against a future tax be given, to the person who pays a tax that was not due. The court concluded that the code sections leave "no room for the district court to pay refunds to anyone other than the taxpayer who is rightfully owed the refund." *Id.* at 152–53. Thus, according to the *Hagge* court, no refund could be paid to an attorney from the total amount of refunds given to the class of taxpayers because each taxpayer had an individual fund. Despite Intervenors' contentions, we find *Hagge* to be inapplicable to this case in that, here, there was no statute prohibiting the court from exercising its power under T.R. 23(D) and awarding attorney's fees from the fund recovered.

In dictum, the Iowa court also found support for its decision from "[c]ommentary regarding actions against the government[,]" concluding that when the government is required to pay damages to a class of people, these damages rarely come from a separate fund but rather come directly from the state's treasury. *Hagge, supra,* 539 N.W.2d at 153. We find this to be a very narrow interpretation of a common fund where the amount distributed is easily identifiable. Thus, in this regard, we find the reasoning in *Hagge* to be unpersuasive.[50]

### 3. Jurisdiction

■ Finally, in another related issue, Intervenors argue that the court did not have jurisdiction over the fund and, thus, did not have the power to grant attorney's fees from such fund pursuant to the common fund doctrine. In support of this proposition, they rely upon several cases, including *Oklahoma Tax Comm'n v. Ricks* (1994) Okla., 885 P.2d 1336, 1339–40, a tax refund case, wherein the court made the following statement: "[t]he majority rule in state and federal courts is that, *before a money pool* may be subjected to a common-fund attorney's-fee assessment, the *created or preserved fund* must be brought under the *direct supervision and control of the court.*" (footnotes omitted) (emphasis in original).[51] However, the court further explained "the *sine qua non of control* is the court's *present authority* to assess an attorney's fee proportionately and accurately from each beneficiary's traceable portion of a distinct pool of funds." *Id.* at 1340 (footnotes omitted) (emphasis in original). We conclude that the trial court in the instant case did have control over the tangible fund, and thus had jurisdiction to award attorney's fees from the fund. The authority to control the fund stems from T.R. 23(D) itself, which states: "[t]he court shall allow reasonable attorney's fees and reasonable expenses incurred from a fund recovered for the benefit of a class...." Having determined that a specific fund exists due to Class Counsel's efforts, and that each class member's benefit may be readily calculated, we conclude that the trial court had jurisdiction to allocate attorney's fees from such fund.

Intervenors also rely upon *Knight v. United States* (1993) Fed.Cir., 982 F.2d 1573, in support of their position that the court had no jurisdiction over the fund from which to award attorney's fees. In *Knight,* several Department of Interior employees instituted a lawsuit, which in

---

**50.** However, the court in *Hagge* also implied that the outcome may have been different had the case been a class action lawsuit, stating that "affected retirees had no opportunity to 'opt out' and avoid the attorney fee claim ... [and] there is no evidence in the record that all 13,000 retirees had actual knowledge of the ... litigation." *Hagge, supra* at 149.

**51.** This appears to be a reasonable rationale with regard to tax refunds as opposed to the narrow view taken by the Iowa Court in *Hagge, supra,* to the effect that the entire amount of each tax refund must be paid to the individual taxpayer and to no other. Such reasoning would appear to preclude payment by the Department of Revenue into escrow the aggregate sum represented by the combination of all individual refunds, and to thereafter be distributed to the entitled individuals.

turn created a change in policy regarding cost of living allowances. As a result of their actions, and upon the timely filing of a claim, an employee could recover back-pay in the amount of a cost of living allowance he was entitled to receive less the amount he was actually paid. However in that case, Knight and his attorney were attempting to recover attorney's fees from the defendant-government, which had already paid reimbursement to the class members, under the premise that the government inappropriately distributed back-pay to the class members, without withholding attorney's fees. That situation would be the equivalent of Class Counsel in this case pursuing the State on the ground that the State should have withheld some of the 4.1 reimbursement to pay attorney's fees if the litigation regarding 4.2 was successful.

As Intervenors noted in their brief, the district court in *Knight* determined, and the circuit court agreed, that there was "no 'res' under the control of the court against which attorney['s] fees could be assessed." *Knight, supra,* 982 F.2d at 1581. However, the court came to this conclusion because the attorneys were attempting to collect money from a fund which had already been distributed to the non-client class members without bringing the non-client class members into the case to contest the purported obligation. The court found that no court had ordered the non-client class members to pay the attorney and, thus, the state had no obligation to hold any portion of the back pay awards for attorney's fees. The court determined that the United States' obligation to "honor" an attorney's fee awarded from a common fund "can only arise from litigation before a court, adequate representation of all parties in interest, identification of a

common fund as to which the government is merely a stakeholder, jurisdiction over the fund by the court directly ..., and exercise of the *judicial* equity power to impose liability on the fund...." *Id.* at 1582 (emphasis in original). These elements were met in this case. The Class was adequately represented as a whole. The settlement resulted in a common fund which was in the best interest of the Class. The court had jurisdiction over the fund by virtue of T.R. 23(D), and the court did exercise its jurisdiction over the fund by awarding attorney's fees to be paid therefrom.

Finally, Intervenors cite *Holbrook v. Pitt* (1984) 7th Cir., 748 F.2d 1168, in which a tenant, who received a rent subsidy through the Department of Housing and Urban Development (HUD), filed a complaint against the housing owner, who had already entered into a contract with HUD but had delayed sending individual tenants the proper Section 8 forms.[52] As a result, the tenant who filed the action, and the other tenants in that housing project, were required to pay the entire rent for their housing for several months. *Id.* at 1171. Eventually, the case blossomed into a class action suit against the Department of Housing and Urban Development (HUD) on behalf of all families who resided or who would reside in housing projects with HUD contracts and who had not received or would not receive benefits as of the date of their Section 8 contracts. The Class and HUD entered a joint motion for approval of their settlement, wherein HUD agreed to provide retroactive rental assistance to the project owners, who would, in turn, reimburse tenants for the extra rent that they had been required to pay because of the delay in the activation of their

---

**52.** At the time of the litigation, Section 8 of the United States Housing Act of 1937, as amended by Section 201(a) of the Housing and Community Development Act of 1974 was codified in part as 42 U.S.C. § 1437f. This legislation, commonly referred to as Section 8, was created to aid families with lower income to secure adequate housing. *Hol-* *brook, supra* at 1170. Through the program, HUD enters into contracts with housing project owners on behalf of low income tenants. *Id.* HUD then makes payments to the owner of the housing project while the tenant pays the difference between the agreed rent and the Section 8 payment. *Id.*

contracts with HUD. The district court then allowed an award of attorney's fees based upon the common fund doctrine.

The circuit court reversed the award of attorney's fees in favor of Holbrook, concluding as follows:

"[n]othing in the way of money or otherwise was transferred by HUD to any fund as a result of this action.... Nothing was said as to where HUD would obtain the funds from which to make its promised payments to the project owners; it was simply an obligation of HUD to provide the payments from any source it saw fit to use.... It is not shown that there is any common fund created by the litigation from which attorneys' fees can be paid, and the District Court, while invoking the 'common fund doctrine,' did not in fact order payment from any fund." *Id.* at 1175–76.

The Seventh Circuit's application of the common fund doctrine is unduly narrow in terms of finding that there was no common fund created by the litigation in that case. The justification for the finding that there was no common fund seems to be that the district court never designated it as such, and although the court did order attorney's fees to be paid, the order never designated the source of the fees. Be that as it may, in this case the fund was identified by the court, and the award of attorney's fees was ordered by the trial court to be paid from such fund. Thus, we find this case to be distinguishable from *Holbrook*.

We find the reasoning in *In Re Air Crash Disaster at Florida Everglades* (1977) 5th Cir., 549 F.2d 1006, to be persuasive on this issue. The court therein found the fact that the money constituting the fund in that case was never in the

hands of the court to be of little importance. The court reasoned as follows:

" '[A] court's reach or "control" though vital, can take many forms. The control can be remote or indirect,.... Central, of course, is authority to adjudicate the rights and duties of interested parties. The tests of control must be expansive because of the variety and complexity of the tasks involved. For the declared object is to redistribute the costs of litigation in fair proportion to the benefits to strangers that it produces. What is important is the sufficiency of the means, not the form they take.' " *Id.* at 1018–19, n. 16 (quoting John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees From Funds*, 87 HARV. L.REV. 1597 (1974)).

We conclude that the trial court had the authority to adjudicate the rights and duties of the parties to this litigation, as well as the authority to award attorney's fees from a fund generated by the litigation pursuant to T.R. 23. Thus, the trial court had jurisdiction over this case and properly awarded fees from the fund recovered.

### C. Reasonableness of Fee Award

 The award of attorney's fees is committed to the sound discretion of the trial court, and we will reverse an award of attorney's fees only upon a showing of abuse of that discretion. *Kellogg v. City of Gary* (1990) Ind., 562 N.E.2d 685. Here, the trial court used the lodestar method, in which the fee award is calculated by multiplying the number of hours expended by a reasonable hourly rate, *see Bayh v. Sonnenburg* (1991) Ind., 573 N.E.2d 398, 401, n. 3 (citations omitted), *reh'g denied, cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415, to determine that Class Counsel would be entitled to $3.6 million.[53] The court also determined that under the

---

**53.** A court may then enhance this figure by using a risk multiplier to arrive at a reasonable fee. *Citizens Action Coalition of Indiana, Inc. v. PSI Energy, Inc.* (1996) Ind.App., 664 N.E.2d 401, 404, n. 1. In the instant case, the

court used a risk multiplier of three, i.e., costs incurred by Class Counsel + (hours expended by Class Counsel X hourly rates of Class Counsel) = $1,216,905.40 X 3 (risk multiplier) = $3.6 million.

percentage method, Class Counsel would be entitled to $9.75 million.[54] After concluding that the former figure was too low to compensate Class Counsel and the latter figure was too high, the trial court decided that it would use neither the lodestar nor the percentage method. Rather, the court determined that $6.25 million would be a reasonable attorney's fee, a figure which fell between the lodestar and percentage figure.

Intervenors contend that "[t]he Trial Court's hybrid percentage-lodestar method of calculating reasonable attorney fees is not supported by law or the record." Intervenors' Brief at 8. In that T.R. 23 does not specify a method to employ in awarding attorney's fees and courts in Indiana have accepted both the lodestar and the percentage methods as reasonable, a properly calculated award under either method is appropriate. *See Citizens Action Coalition of Indiana, Inc. v. PSI Energy, Inc.* (1996) Ind.App., 664 N.E.2d 401, 407 ("[T]he choice between using the percentage of the fund method or the lodestar method in calculating an attorney fee award has traditionally been committed to the trial court's sound discretion.") (citations omitted). As well, our courts have stated that an award which lies between the figures calculated using both methods, when reasonable, is appropriate. *See id.* ("Indiana courts appear to favor flexibility and allow trial courts considerable discretion in calculating attorney fee awards out of common funds."); *Arnold v. Dirrim* (1979) Ind.App., 398 N.E.2d 426 (upholding a trial court's award of $112,267.18, after calculating that percentage method would yield $164,000 and lodestar method would yield $59,000) *reh'g denied.*

The only requirement specifically set forth in T.R. 23 is that the attorney's fee award be reasonable. In determining reasonableness, it is helpful to calculate attor-

ney's fee awards under both the lodestar and percentage methods. The trial court has discretion then to decide if either number is reasonable, or if a more reasonable award lies between the two. The trial court is in the best position to make this determination.[55] Therefore, if the fee award lies between properly calculated lodestar and percentage figures, we will not replace the trial court's judgment with our own, provided the result is not "clearly against the logic and effect of the facts and circumstances before the court." *Arnold, supra,* 398 N.E.2d at 441 (citation omitted). However, before we make that determination, we must first address Intervenors' contention that the trial court misapplied both the percentage and the lodestar methods in determining the attorney's fee award.

### 1. Percentage

Intervenors contend that "[b]ecause there was no need to attract attorneys to this case, the rationale for awarding a 'percentage of the benefit' is absent." Intervenors' Brief at 31 (citing *Pennsylvania v. Delaware Valley Citizens' Council* (1987) 483 U.S. 711, 733, 107 S.Ct. 3078, 97 L.Ed.2d 585) (O'Connor, J., concurring). However, the case cited by Intervenors discussed whether an upward adjustment in the lodestar was appropriate to compensate for the risk of loss. The percentage method was not an issue in that case.

In any event, the lodestar method has been abandoned by several federal courts in common funds cases because it is burdensome, time-consuming and creates a disincentive for attorneys to use their time efficiently. 7B CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1803 (Supp.1999). Rather, the percentage approach is favored by the majority of federal courts when attorney's fees are awarded from a fund. *See, e.g., Blum v.*

---

**54.** The trial court calculated the $9.75 million figure by taking fifteen percent of the common fund of $65 million.

**55.** The trial court has had the opportunity to assess firsthand the various factors which are used to enhance attorney's fee awards, such as the expertise of counsel and the complexity of the issues in the litigation.

*Stenson* (1984) 465 U.S. 886, 900, n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (noting that when calculating attorney's fees under the common fund doctrine, a reasonable fee is usually determined by taking a percentage of the fund bestowed upon the class); NEWBERG & CONTE, *supra*, § 14.03, at 14–5, n. 22; WRIGHT, ET AL., *supra* at § 1803 ("Instead [of using lodestar to determine a reasonable attorney's fee], a percentage fee approach has been utilized with general agreement that a range of 25–30% is justified.").[56]

The dispositive issue then becomes what percentage of the fund may be appropriately awarded as a fee. The court in *Citizens Action, supra,* 664 N.E.2d at 410, noted that while twenty-five percent may be a benchmark in common fund cases, "it is likely to result in a windfall where the recovery totals many millions of dollars." The court further recognized that fee awards typically range between four and ten percent of a fund where the recovery is between $100 and $200 million. *Id.* In *Citizens Action,* for example, we found that an agreed upon award of 9.5% of the $150 million recovered for tax payers did not appear "to be outside the bounds of reasonableness." *Id.* (remanding case to the trial court to assess the reasonableness of the award against a lodestar analysis). Similarly, we do not find the trial court's decision to take fifteen percent of $65 million "to be outside the bounds of reasonableness."

### 2. Lodestar

Intervenors contend that the trial court misapplied the lodestar method first because the billing records were inadequate and, thus, it was impossible to tell whether the hours listed by Class Counsel were reasonably expended. As noted in *Citizens Action, supra* at 407, n. 4, "courts

have found an advantage to using the alternative method [lodestar or percentage] to double check the fee." Contrary to Intervenors' assertion that the trial court applied a risk multiplier of five to the lodestar amount, the trial court used a risk multiplier of three in its determination of the figure yielded by the lodestar method. While the final attorney's fee award equaled five times the lodestar figure, the trial court's determination was that $3.6 million, yielded by the lodestar calculation, did not amount to reasonable compensation for Class Counsel. As a result, the trial court chose a number between the figures generated by the lodestar and percentage calculations. The trial court did not indicate that five was an appropriate risk multiplier. Having so stated, we need not decide today whether a risk multiplier of three or five is an inappropriate number to enhance the lodestar amount or whether the lodestar was correctly calculated. Even assuming the lodestar figure of $3.6 million was too high, it was clearly below the percentage method figure of $9.75 million, which the trial court, in its discretion, could have properly awarded. As noted above, our courts have stated that an award which lies between the lodestar and percentage figures is appropriate where reasonable. Because the trial court was intimately familiar with the efforts put forth by Class Counsel, whereas we are not, and because the final award lies between the lodestar and percentage figures and does not appear to be clearly unreasonable, we will not second-guess the trial court's determination. The figure is less than ten percent of the fund recovered, which is below the norm in a case with a $65 million common fund. Thus, we conclude that the trial court did not abuse its

---

**56.** We do not imply disaffirmance of the use of the lodestar method. Rather, we are merely refuting Intervenors' contention that the percentage method should be used only in undesirable cases so that competent counsel is attracted by the possibility of obtaining a percentage of the recovery. We do not find

this to be the case, in that several federal courts are no longer using the lodestar method at all. Nevertheless, we find that the use of both methods is perhaps the most efficient way to determine a reasonable fee. *See Citizens Action, supra,* 664 N.E.2d 401, 406, n. 4.

discretion by awarding Class Counsel $6.25 million in attorney's fees.[57]

### D. Purchased Immunity Doctrine

█ Intervenors contend that they have "purchased immunity" from paying attorney's fees in light of the fact that they "specifically rejected Class Counsel as their attorneys, and instead intervened [in the 4.2 litigation] and hired their own attorneys to represent their interests in this case...." Intervenors' Brief at 21. Initially, we note that the record reveals that Intervenors paid membership dues to the IHCA who paid Intervenors' Counsel; there was no direct payment of fees from Intervenors to Intervenors' Counsel. (Fee R. 3189). Nonetheless, the IHCA dues clearly provided the source from which Intervenors' Counsel was paid. Therefore, for purposes of addressing this issue, we will proceed as if IHCA members paid Intervenors' Counsel's fees.

As noted, the purpose of the common fund doctrine is to prevent fund claimants from taking advantage of the representative class member's efforts without contributing to the cost of the litigation. While the purchased immunity doctrine has not been utilized in Indiana, other jurisdictions have found that if a claimant to a fund is independently represented, that party is generally "deemed not to have taken a 'free ride' on the efforts of another's counsel[,]" and thus, should not be required to pay another's attorney's fees. *United States v. Tobias* (1991) 4th Cir., 935 F.2d 666, 668 (citations omitted). However, as the *Tobias* court noted, exceptions have been applied where there are express or implied agreements as to who will function as lead counsel for the Class, or there is extraordinary disparity in counsels' efforts. *Id.* at 669.

We find that this case does not fit squarely with the rule or the exceptions to the rule. Cases to which the purchased immunity doctrine has been applied as a complete ban on contributions to the fee award are often ones in which the fund claimant and the party seeking contribution from the fund claimant have been represented separately, with little or no aid from one another's counsel, often with both fund claimants having separate interests in their pursuit of the fund. *See, e.g., Tobias, supra,* 935 F.2d at 668; *Vincent, supra,* 557 F.2d 759 (purchased immunity doctrine was applied toward one faction of the class which was represented by an attorney who negotiated settlement with the defendants before class counsel was even appointed in that case); *Haynes v. Rederi A/S Aladdin* (1966) 5th Cir., 362 F.2d 345, 351 ("[The Texas Employers' Insurance Association] TEIA explicitly rejected the attorneyship proffered by appellant's attorneys. In fact it employed its own attorneys ... and these counsel ... actively asserted its rights throughout the trial. Thus, TEIA's own counsel were responsible, at least in large part, for the reimbursement allowed it."), *cert. denied,* 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557. We do not find this to be the case in this litigation. Here, the trial court found that Intervenors and the Class shared the common interest of enjoining Rule 4.2 and the prevention of the recoupment of Medicaid reimbursement by the State, and that their interests diverged only upon the issue of attorney's fees. Both relied upon each other's efforts and acted cooperatively until the time of the settlement agreement.

While we conclude that Class Counsel played a greater role in obtaining the benefits for the Class by negotiating the settlement agreement, we acknowledge that Intervenors' counsel played a large part in the attainment of the preliminary injunction and in planning strategy during the litigation. Intervenors contend that in

---

**57.** We come to this conclusion even though we have concluded that the trial court improperly found "intangible benefits." The Class received tangible benefits in the amount of $65 million. Considering that this was a substantial benefit, we cannot say that the trial court's award of $6.25 million was unreasonable.

such instance, courts have "applied the Purchased Immunity Doctrine as a complete ban on fee awards from parties that have purchased immunity by hiring their own attorneys." Intervenors' Brief at 27. Class Counsel argues, and it is reasonably supported by the record, that both of the exceptions to the purchased immunity doctrine could be applied in this case.[58] However, we think a better reasoned approach in a case such as this one, where both Class Counsel and Intervenors' Counsel have provided significant services benefitting the entire class, is for the trial court to create a scheme where class members are not punished for employing their own counsel by being required to pay the fees of both their own counsel, through the IHCA, and Class Counsel.[59] However, rather than being able to escape entirely from contributing to the Class Counsel fee award, where Intervenors have certainly benefitted from Class Counsel's actions, the reasonable amount they have paid to Intervenors' Counsel, through the IHCA, should be credited against the amount they must pay to Class Counsel.[60] Thus, we conclude that the most equitable solution in this litigation lay in the trial court's crediting Intervenors for the reasonable fees paid to their own attorneys, and to require them to pay Class Counsel fees only to the extent that they did not pay their own counsel.[61] However, because In-

58. In the initial agreement between Class Counsel and Intervenors' Counsel, dated October 12, 1990, Intervenors' Counsel agreed that they would not "usurp" Class Counsels' role as lead counsel in the litigation. (Fee R. 2979). This initial agreement was superseded by a second agreement between the two, dated May 9, 1991, which indicates that although the Class would continue to be represented by Class Counsel, the Intervenors would be separately represented by Intervenors' Counsel. (Fee R. 2465). Despite this agreement, there is other evidence in the record of an implicit agreement that Class Counsel would remain lead counsel, i.e., a letter written by Intervenors' Counsel to one Intervenor stating that while the IHCA and Intervenors' Counsel had discussed entering separately into negotiations for settlement with the government, they had decided to instead defer to Class Counsel in their negotiations. (Fee R. 3030).

Secondly, while Intervenors played an important role in gaining for the Class additional reimbursement via the Preliminary Injunction, Class Counsel played a crucial role during the entirety of the litigation, including being solely responsible for the settlement agreement which preserved the fund by preventing the State from seeking reimbursement from the Class for the additional money paid to the Class during the 4.2 litigation.

59. In order to grant a credit to a fund claimant against the amount allocated for payment to Class Counsel, it must be shown that the claimant's attorney benefitted the Class as a whole, rather than benefitting only the individual claimant. In this case, it is clear that Intervenors' Counsel provided assistance which benefitted the entire class.

60. Generally, in an instance such as this, where Intervenors' Counsel have significantly aided the Class in its recovery, they too will petition the court for a fee to be paid from the fund, so that their fees may be proportionately paid by the class who reaps a benefit from their involvement. *See* John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees From Funds*, 87 HARV. L. REV. 1597, 1649 (1974) ("One alternative [to the purchased immunity doctrine] is for a court, having 'control' over the fund, to undertake to apportion fees according to the relative contributions of the active and less active counsel.").

61. This proposition is supported by *Vincent v. Hughes Air West, Inc.* (1977) 9th Cir., 557 F.2d 759, wherein the court found that, with the exception of those class members who settled prior to the appointment of class counsel, class members who were represented by independent counsel were required to pay the lead counsel's attorney's fees because of the disparity of contribution between lead counsel and counsel to other members of the class. The court's conclusion was further "reinforced" by the fact that the trial court had been careful to create a payment scheme whereby claimants were not required to "double" pay attorney's fees. Further, in *United States v. Tobias* (1991) 4th Cir., 935 F.2d 666, two parties held conflicting titles to land which the government was attempting to condemn. One party, Johnson, negotiated with the government causing it to raise the bid from $329,000 to $425,000. Tobias, the other party, independently caused the government to raise that bid from $425,000 to $475,000. The 4th Circuit reversed an order of the trial court requiring Tobias to pay part of Johnson's attorney's fees, finding that the two parties had been adversarial, and that Johnson had attempted to keep Tobias from receiving

tervenors failed to provide the trial court with a list of class members who were members of the IHCA, the trial court achieved this end, to the extent that it was possible, by crediting the entire class for the payment of those fees, instead of crediting only the class members who had paid dues to the IHCA.[62] Because the memberships in the Class and the IHCA significantly overlap, we cannot conclude that the trial court abused its discretion in crediting the entire class with the payments made by the IHCA.

### E. Errors in Amended Fee Entry

█ Intervenors contend that the Amended Fee Entry requires providers to pay attorney's fees whether or not they were the operators of the facilities at the time of the injunction. Intervenors also contend that the Amended Fee Entry allows Class Counsel to collect fees from providers who care for mentally retarded individuals, not Medicaid patients. We conclude that no reversible error was committed.[63]

Initially, we note that Intervenors failed to allege that any of the Intervenors on appeal were affected by any of the alleged errors. Our Supreme Court stated "[s]tanding focuses generally upon the question whether the complaining party is the proper person to invoke the Court's power. However, more fundamentally, standing is a restraint upon this Court's exercise of its jurisdiction in that *we cannot proceed where there is no demonstrable injury to the complainant before us.*" *Pence v. State* (1995) Ind., 652 N.E.2d 486, 488 (emphasis in original), *reh'g denied.*

Because Appellant Intervenors have failed to demonstrate that they were the health care facilities injured by the alleged errors, we conclude that they may not assert these errors upon appeal.

### Conclusion

We acknowledge that an attractive resolution to this seemingly interminable litigation would be to either (1) affirm in all respects or (2) reverse as to the matter of attorney's fees and remand for a *de novo* reconsideration of the entire matter. Notwithstanding that superficial attractiveness, particularly in light of the fact that our decision may spawn yet another series of cases winding their way through the judicial system, we are obligated to decide the issues based upon our application of the controlling or persuasive principles of law to all varying aspects of the issues before us.

Accordingly, we hold that the trial court did not abuse its discretion in concluding that the settlement agreement is fair, reasonable and adequate. Further, as Intervenors failed to establish prejudice with regard to their discovery claim, we find no basis for reversal. Finally, while we uphold the $6.25 million attorney's fee award as reasonable, we conclude that the fee award was improperly based upon intangible benefits. Therefore, we remand to the trial court to reapportion the fee, so that the amount the facilities named in this appeal are required to pay in attorney's fees is in proportion to the amount of tangible benefits received. As well, we remand to the trial court to determine

---

any benefit. The court concluded that Tobias had not taken a free ride, in that his efforts caused the bid to be raised an additional $50,000. The court further stated that "Tobias received no set-off in the fee award for the benefit he thus gratuitously conferred on Johnson." *Id.* at 669. This implies that had the two parties' interests been common, the purchased immunity doctrine would not have operated as a complete ban on Tobias' obligation to pay fees. Rather, the court suggested that the obligation would be "set-off" by the contribution made by Tobias.

**62.** The record reveals that over half of the Class were members of the IHCA, which is funded by membership dues. (Sett. R. 1500).

**63.** Intervenors additionally contend that the trial court erred by counting the beds of certain facilities more than once in the allocation of fees. However, because we previously concluded that the trial court erred in allocating fees based upon the intangible benefits conferred upon the Class, we need not address this issue.

whether the appropriate amount of attorney's fees paid by the IHCA was credited to class members.[64]

SHARPNACK, C.J., and HOFFMAN, Sr.J., concur.

---

**64.** Intervenors' Counsel, Mr. Harkins, testified that his firm was paid approximately $220,365.75 in attorney's fees and that the IHCA paid expert fees related to the 4.2 litigation. (Fee R. 3011–12). If this is the case, and the fees paid were reasonable, this is the amount with which the class members should have been credited. However, in the trial court's conclusions of law included in the fee entry, the trial court stated that it credited the Class with $202,000. We are unable to determine from the record why the trial court credited the Class with this amount rather than the amount included in Mr. Harkins' testimony. Thus, the trial court may address this inconsistency upon remand.